653 A.2d 1040

STATE of Maryland

v.

Samuel JONES, Jr.

No. 1271, Sept. Term, 1994.

Court of Special Appeals of Maryland.

Feb. 14, 1995.

**550**

,Kathryn Grill Graeff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Frank R. Weathersbee, State's Atty. for Anne Arundel County, Annapolis, on brief), for appellant.

No brief or appearance by appellee.

Argued before MOYLAN, BISHOP and BLOOM, JJ.

MOYLAN, Judge.

## I. Introduction

In the one-third of a century that has transpired since the Supreme Court held in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), that the Exclusionary Rule of Evidence, as a sanction for a violation of the Fourth Amendment, was binding on the states, there have been untold thousands of instances in which appellate courts, state and federal, have been called upon by defendants to reverse determinations by suppression hearing judges and trial judges that probable cause, to support either a search warrant or appropriate warrantless activity, *did* exist. Where interlocutory appeals by the prosecution have been statutorily autho-

rized, there have been hundreds, if not thousands, of instances where appellate courts have been called upon by prosecutors to reverse determinations by suppression hearing judges that probable cause did *not* exist.

Despite the vital and ongoing importance of the probable cause question and the frequency with which it has arisen and will continue to arise, the Supreme Court has remained through all of those years cryptically silent, in the warrantless context at least, as to what the proper standard of review should be and as to how appellate courts should handle their reviewing obligation. Incomprehensibly, the case law from the lower federal courts and from the state appellate courts alike has been almost equally bereft of any in-depth guidance as to *what* the appropriate standard of appellate review is—let alone as to *why* it is. Those unanswered questions, ironically, go to the very heart of the appellate process.[1] In the appellate business, we think about a lot of things, but we seldom think about thinking. We tend to neglect the most basic tools of our craft.

Pursuant to the provisions of Md.Code Ann., Cts. & Jud. Proc. § 12-302(c)(3), the State is asking us to reverse the pretrial decision by Judge Raymond J. Thieme, Jr. in the Circuit Court for Anne Arundel County that certain physical evidence be suppressed. As to whether we should do so 1) because Judge Thieme was clearly erroneous in failing to find probable cause; 2) because he clearly abused his discretion in suppressing the evidence; 3) because he was wrong, as a matter of law, in failing to find probable cause; or 4) because we, without necessarily finding any error on his part, should simply "trump" his decision by way of our own *de novo* decision to the contrary, the State is understandably vague. In the service of its immediate purpose, any of the above will suffice. If the State gets the right answer, the question hardly matters.

---

1. It is almost as if there is a pervasive, and perhaps subconscious, appellate conspiracy in service of the notion that when no satisfactory answer to a question can be found, it is discreet to ignore the question.

For us, however, the problem is not in finding the right answer; it is in asking the right question. What precisely was Judge Thieme's finding? What was the essential nature of that finding? What standard of appellate review should be applied to such a finding?

## II. The Present Case

The appellee, Samuel Jones, Jr., was indicted by the Anne Arundel County grand jury for both the possession and the distribution of crack cocaine. On the night of December 16, 1993, Officer Sean W. Ottey recovered a quantity of crack cocaine from Jones's left front pants pocket. As the State acknowledges, as a precondition of taking this appeal pursuant to § 12–302(c)(3)(iii), the case against Jones rises or falls with the admissibility of that crack cocaine. Jones moved, pretrial, to have the cocaine suppressed on the ground that it was the product of an unconstitutional search and seizure under the Fourth Amendment. A suppression hearing was held on July 7, 1994. On August 1, Judge Thieme ruled that the evidence be suppressed.

Although three witnesses testified at the suppression hearing, we can narrow our focus onto the testimony of the State's key witness, Officer Ottey. Officer Thomas Rice also testified for the State, but his testimony did no more than corroborate that of Officer Ottey and will figure no further in our analysis. The appellee, Samuel Jones, Jr., also testified but Judge Thieme did not find his testimony to be credible and rejected it. For analytic purposes, therefore, it is as if Jones had never taken the stand. The only testimony that matters is that of Officer Ottey. Judge Thieme found Officer Ottey to be credible and accepted his eyewitness account of the critical events, although not necessarily his "expert" opinion.

Officer Ottey described the neighborhood in the vicinity of Carver Street and Dorsey Avenue in Annapolis where he was on routine patrol on the evening of December 16. He characterized the area as one known to be "an open-air drug market." Judge Thieme found Officer Ottey to be credible and accepted as a fact that the area was, indeed, a well-known

open-air drug market. Officer Ottey testified that he had received numerous complaints from citizens in the community about drug transactions taking place and that he and other Annapolis police officers had made numerous drug arrests in the area. He testified further that in the course of making those drug arrests and patting down the drug suspects, he had found weapons and crack cocaine. He testified that the crack cocaine was usually packaged in small, self-sealing, clear plastic envelopes. This characterization of the neighborhood we accept as a given, because Judge Thieme did, as we proceed with our analysis.

### III. The Consent Search

Officer Ottey testified that he observed Jones standing with another individual on the corner of Carver Street and Dorsey Avenue. Officer Ottey approached Jones, told him that he was in a known drug area, and asked him why he was there. The question was apparently rhetorical for the officer did not await an answer. Officer Ottey then asked Jones "if he had any drugs or ... guns on him and if I could check him." Jones indicated that he did not have drugs or guns on his person and gave Officer Ottey permission to "check him."

Although Jones, to be sure, gave a diametrically contrary account of that prelude to the search, Judge Thieme accepted Officer Ottey's version of the events. His finding that the ensuing search was consensual had solid support in the evidence, to wit, in the testimony of Officer Ottey.[2] We also accept that finding by Judge Thieme as a given for purposes of further analysis.

The ensuing consensual "check" of Jones for "drugs and/or guns" *coincidentally* resembled a frisk for weapons. Officer Ottey testified that he "began a pat-down, checking him, starting up at the upper part of his body working my way to the lower part of his body." We stress the merely coinciden-

---

2. We hasten to add that an opposite finding would also have had solid support in the evidence, to wit, in the testimony of the appellee, Samuel Jones.

tal nature of that resemblance, however, for this was not a "frisk" within the contemplation of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). This intrusion was not based on articulable suspicion to believe that Jones was armed. It was based on consent and was, therefore, limited only by the limits imposed on that consent.[3] Consequently, there was no doctrinal requirement that it necessarily be limited in scope to a pat-down of the exterior of the clothing surface.

A consensual "check" for *weapons* might well be interpreted as being thus limited, but a consensual "check" for *drugs* could just as reasonably have been interpreted by the officer to confer permission to go into the pockets. *Florida v. Jimeno,* 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). For whatever reason, however, Officer Ottey did not push the consensual "check" of Jones beyond the limits typically associated with a formal "frisk" for weapons. Although not dealing with a formal "frisk" as that term of art is used, we nonetheless end up with an indistinguishable pat-down of the exterior of the clothing surface.

In the course of that pat-down and while the consent was still operational, Officer Ottey felt something in Jones's left front pants pocket. He described his tactile sensation:

A: When I squeezed it, prior to him revoking consent, I could feel the numerous rock-like substances in there, and I knew right then and there that I had crack cocaine . . . in his pocket.

Q: Based on your training and experience, was it readily apparent what it was, the nature of the substance?

A: Yes, sir.

---

**3.** Literally, of course, what matters is not the scope of the consent *actually* given by the suspect, but what the officer *reasonably* believes the scope of that consent to be. *Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *Florida v. Jimeno,* 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991); *Wilkerson v. State,* 88 Md.App. 173, 184–87, 594 A.2d 597 (1991); *Burks v. State,* 96 Md.App. 173, 198–99, 624 A.2d 1257 (1993).

What we have as a given, based on Judge Thieme's acceptance of the credibility of Officer Ottey as to his first-hand observations, is the fact that Officer Ottey, from outside Jones's pants, felt a bulge in the pocket, squeezed it, and felt "numerous rock-like substances." Whether we also have as a given Officer Ottey's conclusion that what he felt was crack cocaine is far more problematic and will be discussed in detail as our analysis progresses. What Judge Thieme said with respect to Officer Ottey's conclusion was:

> I have to make my determination as to whether I am going to accept the expert's opinion based upon the facts upon which his opinion was based. And there are insufficient facts for me to accept that opinion.

■ At that point in the pat-down process, Officer Ottey, upon feeling the rock-like substances, asked Jones what the rock-like substances were. Rather than answer the question, Jones said, "I don't want to be checked anymore." At that point, the consent was indisputably at an end. The overarching principle with respect to consensual searches is that the scope of the consent, both in terms of the intensiveness of the search and in terms of the duration of the search, is in the total control of the consenting party.

Based upon his conclusion that what he had felt through the pants pocket was crack cocaine, Officer Ottey, notwithstanding the withdrawal of the consent, then reached into Jones's pocket and seized the crack cocaine. Because a rationale based on consent was viable only through the moment of the initial squeeze but had become a dead letter by the time that Officer Ottey reached *into* the pocket and actually seized the crack cocaine, that seizure must rest, if it is to be deemed reasonable, on some other Fourth Amendment rationale. In the brief moment between Officer Ottey's 1) feeling what was in the pocket *from the outside* and 2) going *into* the pocket, the doctrinal landscape had shifted dramatically.

## IV. The Plain–Feel Doctrine

The ultimate seizure of the crack cocaine from Jones's pocket, the Fourth Amendment propriety of which is the only

issue before us, was warrantless. As such, it was presumptively unconstitutional. *Coolidge v. New Hampshire*, 403 U.S. 443, 454–455, 91 S.Ct. 2022, 2031–32, 29 L.Ed.2d 564, 576 (1971). For the seizure to be deemed reasonable, it would have to fit within one of the recognized exceptions to the warrant requirement.

There is a single candidate for that honor. It is the recently recognized Plain Feel Doctrine of *Minnesota v. Dickerson*, 508 U.S. ——, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). The Plain Feel Doctrine is an analogue of or variation on the Plain View Doctrine, itself first recognized in the plurality opinion of Justice Stewart in *Coolidge v. New Hampshire*, 403 U.S. 443, 464–73, 91 S.Ct. 2022, 2037–42, 29 L.Ed.2d 564, 581–87 (1971). The Plain Feel Doctrine shares all of the requirements and all of the characteristics of the Plain View Doctrine, save only for the substitution of fingers for eyes.

Indeed, because of their common doctrinal base, the two phenomena will in all likelihood come to be seen, probably within a decade, as nothing more than instances or variations of an omnibus Plain Sense Doctrine or Plain Perception Doctrine, which will embrace plain view and plain feel and, by a logically compelling growth process, plain hearing, plain smell, and plain taste. Awaiting that possible new dispensation, it is enough to note that to understand plain feel in the doctrinal sense, be it a variation or be it an analogue, one must first understand plain view.

### A. The Basic Plain View Doctrine

One of the fundamental characteristics of the Plain View Doctrine is that it is exclusively a seizure rationale. No searching at all, no matter how minimal, may be done under the aegis of the Plain View Doctrine. *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987). The Plain View Doctrine is nonetheless a recognized exception to the warrant requirement, for the obvious reason that the Fourth Amendment prohibits unreasonable seizures as surely as it prohibits unreasonable searches. If, therefore, the police

presume to seize property warrantlessly, some justification is required for that seizure to be deemed reasonable. That, in appropriate circumstances, is the office of the Plain View Doctrine.

A second fundamental characteristic is that the Plain View Doctrine, unlike most of the other exceptions to the warrant requirement (all but Consent), is not predicated on any sort of exigency. It is permitted in the interest of police convenience. *Coolidge v. New Hampshire*, 403 U.S. at 468, 91 S.Ct. at 2039. It is deemed unreasonably inconvenient to require the police, once they have already made a valid intrusion and have spotted probable evidence in plain view, to leave, obtain a warrant, and then return to resume a process already in progress, the chickens in the meantime perhaps having flown the coop. *Coolidge v. New Hampshire*, 403 U.S. at 467–68, 91 S.Ct. at 2038–39. *Arizona v. Hicks*, 480 U.S. 321, 327, 107 S.Ct. 1149, 1153–54, 94 L.Ed.2d 347, 355 (1987), reaffirmed that an animating purpose of the Plain View Doctrine "is the desirability of sparing police ... the inconvenience and the risk ... of going to obtain a warrant":

> [T]he practical justification for that extension is the desirability of sparing police, whose viewing of the object in the course of a lawful search is as legitimate as it would have been in a public place, the inconvenience and the risk—to themselves or to preservation of the evidence—of going to obtain a warrant.

The reason so light and transient a justification as police convenience is deemed reasonable is because of the absolutely minimal risk posed by the Plain View Doctrine to either of the two traditional Fourth Amendment values or concerns. *Coolidge v. New Hampshire*, 403 U.S. at 467, 91 S.Ct. at 2038–39. In terms of the initial intrusion or breach into the zone of privacy, the Plain View Doctrine, by definition, poses no threat whatsoever. It does not authorize the crossing of a threshold or other initiation of an intrusion. It does not even come into play until the intrusion is already a valid *fait accompli*. *Id.*

In terms of the other traditional Fourth Amendment concern, preventing even a validly initiated search from degenerating into an exploratory fishing expedition or general rummaging about, the Plain View Doctrine, again by definition, poses no threat whatsoever, for it authorizes not even the most minimal of further searching. It authorizes only the warrantless seizure by the police of probable evidence already revealed to them, with no further examination or searching being involved. *Coolidge v. New Hampshire*, 403 U.S. at 466, 91 S.Ct. at 2038.

■ The Plain View Doctrine, it must also be noted, does not cover every situation in which the police legitimately see probable evidence in *open* view. There are a large number of permutations of what the police may reasonably do following a legitimate *open* view, depending, for instance, upon such considerations as whether the police, in terms of a constitutionally protected area, are 1) outside looking outside, 2) outside looking inside, or 3) already inside looking inside. *See Texas v. Brown*, 460 U.S. 730, 738 n. 4, 103 S.Ct. 1535, 1541 n. 4, 75 L.Ed.2d 502, 511 n. 4 (1983); *Scales v. State*, 13 Md.App. 474, 478 n. 1, 284 A.2d 45 (1971). The Plain View Doctrine with a capital "P" and a capital "V" and worthy of the designation "Doctrine" is far more limited. It may be invoked to justify the warrantless seizure of evidence if, but only if, three conditions are satisfied.

### 1. Prior Valid Intrusion

One never crosses the threshold of a constitutionally protected area or otherwise initiates a Fourth Amendment intrusion under the authority of the Plain View Doctrine. Such intrusions must be based on other and prior justifications. A Plain View Doctrine seizure may then, other conditions being satisfied, be an *incident* or *consequence* of the justified intrusion. It is never the rationale for the intrusion. In the words of *Coolidge*, 403 U.S. at 466, 91 S.Ct. at 2038, "The doctrine serves to supplement the prior justification." *Texas v. Brown*, 460 U.S. 730, 738–39, 103 S.Ct. 1535, 1541–42, 75 L.Ed.2d 502, 511 (1983), expanded on that conceptualization:

"Plain view" is perhaps better understood, therefore, not as an independent "exception" to the Warrant Clause, but simply as an extension of whatever the prior justification for an officer's "access to an object" may be.

The principle is grounded on the recognition that when a police officer has observed an object in "plain view," the owner's remaining interests in the object are merely those of possession and ownership....

*Coolidge,* 403 U.S. at 465–66, 91 S.Ct. at 2037–38, went to great length to catalogue what such prior valid intrusions might be:

An example of the applicability of the "plain view" doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character. Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate. Thus the police may inadvertently come across evidence while in "hot pursuit" of a fleeing suspect. And an object that comes into view during a search incident to arrest that is appropriately limited in scope under existing law may be seized without a warrant. Finally, the "plain view" doctrine has been applied where a police officer is not searching for evidence against the accused, but nonetheless inadvertently comes across an incriminating object. (citations and footnote omitted).

The catalogue of justifications for prior valid intrusions would also include a *Terry*-type "frisk," *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); the execution of a search warrant for some other purpose, *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990); an exigent search for guns and gunmen, *Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987); or, pertinently for present purposes, a voluntarily consensual search or pat-down.

Although *Coolidge* was dealing with the crossing of a threshold (the running board of an automobile) into a constitutionally protected area, it also spoke in more general terms, 403 U.S. at 466, 91 S.Ct. at 2038, of this entry-level requirement as "a prior justification *for an intrusion*":

> What the "plain view" cases have in common is that the police officer in each of them had *a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused.* (Emphasis supplied.)

*Coolidge* explained, 403 U.S. at 467, 91 S.Ct. at 2039, why the requirement of a prior valid intrusion eliminated, by definition, any risk to the Fourth Amendment interest in preventing an intrusion into a citizen's privacy:

> The "plain view" doctrine is not in conflict with the first objective because plain view does not occur until a search is in progress. In each case, this initial intrusion is justified by a warrant or by an exception such as "hot pursuit" or search incident to a lawful arrest, or by an extraneous valid reason for the officer's presence.

### 2. The Spotting of an Object in Plain View

It is the second and third requirements of the Plain View Doctrine in combination that eliminate any risk to the other Fourth Amendment concern, the preventing of an initially valid but limited intrusion from degenerating into a general search or exploratory rummaging about. One does not search, explore, or rummage under the authority of the Plain View Doctrine. One is limited to the *seizure* of items which in the course of an otherwise valid intrusion already are or come into plain view. *Coolidge* explained, 403 U.S. at 467, 91 S.Ct. at 2039:

> [G]iven the initial intrusion, *the seizure of an object in plain view* is consistent with the second objective, since it does not convert the search into a general or exploratory one. (Emphasis supplied.)

Although *Coolidge* was dealing only with the sense of sight, it broadened its description of the rationale, 403 U.S. at 468, 91 S.Ct. at 2039, to include the "testimony of the senses" generally:

Incontrovertible *testimony of the senses* that an incriminating object is on premises belonging to a criminal suspect *may establish the fullest possible measure of probable cause.* (Emphasis supplied.)

Paving the way for a possible expansion of the Plain View Doctrine to include knowledge gained through the other senses, *Texas v. Brown,* 460 U.S. 730, 739, 103 S.Ct. 1535, 1542, 75 L.Ed.2d 502, 512 (1983), spoke not of sight specifically but of perception generally:

[O]ur decisions have come to reflect the rule that *if,* while lawfully engaged in an activity in a particular place, *police officers perceive a suspicious object, they may seize it immediately.* This rule merely reflects an application of the Fourth Amendment's central requirement of reasonableness to the law governing seizures of property. (Emphasis supplied.)

In terms of that second requirement, the *Coolidge* opinion itself spoke not simply of the object of ultimate seizure being in plain view but further required that the viewing or spotting of the object be *inadvertent.* It was apparently seeking to guard against the danger that an otherwise valid intrusion might be used opportunistically as an excuse for a planned reconnaissance confirming through plain view what the police already suspected and perhaps actually expected. The Plain View Doctrine as announced in *Coolidge,* including the so-called inadvertence requirement, was, however, only a plurality opinion of the Supreme Court and was not constitutionally binding. After nineteen years of doubt as to whether the inadvertence requirement was, indeed, part of the Plain View Doctrine or not, *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990), answered that question squarely in the negative. A solid majority of the Supreme Court in

*Horton* made it clear that inadvertence was not and never had been a requirement of the Plain View Doctrine.

Indeed, as part of its reason for rejecting the inadvertence requirement, *Horton v. California,* 496 U.S. at 141–42, 110 S.Ct. at 2310, pointed out that the Fourth Amendment's dominant concern, the privacy interest, had already been breached (the evidence had been discovered) and that the ensuing seizure only engaged the gears of the Fourth Amendment's lesser concern with the custody of property:

> As we have already suggested, by hypothesis *the seizure* of an object in plain view *does not involve an intrusion on privacy.* If the interest in privacy has been invaded, the violation must have occurred before the object came into plain view and there is no need for an inadvertence limitation on seizures to condemn it. The prohibition against general searches and general warrants serves primarily as a protection against unjustified intrusions on privacy. But *reliance on privacy concerns* that support that prohibition *is misplaced when the inquiry concerns the scope of an exception that merely authorizes an officer with a lawful right of access to an item to seize it* without a warrant. (Emphasis supplied.)

### 3. *"Immediately Apparent"* = *Probable Cause*

To justify the warrantless seizure of a suspect's property, it is not enough that there has been a prior valid intrusion and that the object of seizure then be perceived in plain view. It is also required that the police, prior to seizure, have probable cause to believe that the object is evidence of crime. The *Coolidge* opinion itself never used the phrase "probable cause." It simply, in passing, used the phrase "immediately apparent." It did so in a context, however, that equates with probable cause. The police, as a precondition to seizure, are not permitted merely to suspect that an object might be evidence and then to conduct a further examination of it to confirm that suspicion. The plurality opinion stated, 403 U.S. at 466, 91 S.Ct. at 2038:

Of course, the extension of the original justification is legitimate *only where it is immediately apparent* to the police that they have evidence before them; the "plain view" doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges. (Emphasis supplied.)

Although only in the course of briefly quoting *Coolidge, Horton v. California*, 496 U.S. at 136, 110 S.Ct. at 2307–08, did revert on one occasion to the "immediately apparent" phraseology.

Nine years after *Coolidge*, however, *Payton v. New York*, 445 U.S. 573, 587, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639, 651 (1980), spoke of that third requirement expressly in terms of "probable cause":

The seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, *assuming that there is probable cause* to associate the property with criminal activity. (Emphasis supplied.)

Three years after the *Payton v. New York* decision, the Supreme Court decided *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). It expressed strong reservations about its earlier use of the phrase "immediately apparent," particularly because some courts, such as the Court of Criminal Appeals of Texas in that case, had been misled into concluding that the phrase meant that the officer "must be possessed of near certainty as to the seizable nature of the items." 460 U.S. at 741, 103 S.Ct. at 1543. The *Texas v. Brown* opinion initially concluded that the phrase was "an unhappy choice of words":

Decisions by this Court since *Coolidge* indicate that the use of the phrase "immediately apparent" was very likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the "plain view" doctrine.

*Id.* The *Brown* Court then referred to its earlier decision of *Colorado v. Bannister*, 449 U.S. 1, 101 S.Ct. 42, 66 L.Ed.2d 1

(1980), and concluded that that opinion had correctly used the traditional concept of probable cause to describe the pertinent requirement. It observed, 460 U.S. at 741, 103 S.Ct. at 1543:

> The Court [in *Colorado v. Bannister*] held that these facts supplied the officer with "probable cause," and therefore, that he could seize the incriminating items from the car without a warrant. Plainly, the Court did not view the "immediately apparent" language of *Coolidge* as establishing any requirement that a police officer "know" that certain items are contraband or evidence of a crime. (Citation omitted.)

*Texas v. Brown* went on to quote with approval the probable cause language from *Payton v. New York* and, 460 U.S. at 742, 103 S.Ct. at 1543, placed its official *imprimatur* upon it:

> We think this statement of the rule from *Payton* ... requiring probable cause for seizure in the ordinary case, is consistent with the Fourth Amendment and we reaffirm it here. (footnote omitted).

*Texas v. Brown*, however, suffered the same impediment as did that part of the *Coolidge* opinion that had announced the Plain View Doctrine. Both were merely plurality opinions and were not, therefore, constitutionally binding precedent. The first full-length treatment of the Plain View Doctrine by the Supreme Court that commanded a solid majority of the Court was *Arizona v. Hicks*, 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).

It addressed, *inter alia*, the quality of the belief an officer must possess before seizing evidence under the banner of the Plain View Doctrine. The phrase "immediately apparent" was mercurial and had no settled legal meaning. It might mean probable cause. It might mean something more than probable cause, as the Court of Criminal Appeals of Texas had concluded at an earlier stage of *Texas v. Brown*. It might mean something less than probable cause, as Justice O'Connor would conclude in her dissent in *Arizona v. Hicks*. In settling upon a more concrete term with a known meaning rather than the earlier, more mercurial, and, indeed, only passing refer-

ence from *Coolidge,* the *Hicks* majority was unequivocal, 480 U.S. at 326, 107 S.Ct. at 1153, that the level of certitude had to be probable cause:

> We have not ruled on the question whether probable cause is required in order to invoke the "plain view" doctrine. *Dicta* in *Payton v. New York* suggested that the standard of probable cause must be met, but our later opinions in *Texas v. Brown* explicitly regarded the issue as unresolved.
>
> *We now hold that probable cause is required.* (Citations omitted and emphasis supplied.)

It reiterated, 480 U.S. at 327, 107 S.Ct. at 1154, that in the absence of certain operational exigencies, nothing less than probable cause will ever suffice:

> No special operational necessities are relied on here, however—but rather the mere fact that the items in question came lawfully within the officer's plain view. *That alone cannot supplant the requirement of probable cause.* (Emphasis supplied.)

*Hicks* expressly held that any further search or examination involving a further intrusion into privacy, once the justification for the initial intrusion has dissipated, must be based on nothing less than probable cause, just as surely as an actual seizure of property must be based on probable cause. Justice Scalia observed, 480 U.S. at 326, 107 S.Ct. at 1153:

> It is clear, therefore, that the search here was valid if the "plain view" doctrine would have sustained a seizure of the equipment.
>
> There is no doubt it would have done so *if Officer Nelson had probable cause* to believe that the equipment was stolen. (Emphasis supplied.)

In *Minnesota v. Dickerson,* 508 U.S. ——, ——, 113 S.Ct. 2130, 2137, 124 L.Ed.2d 334, 345 (1993), the Supreme Court, relying on *Arizona v. Hicks,* expressly treated "probable cause" and the state of being "immediately apparent" as synonymous terms within a single sentence.

The phrase "immediately apparent" has, perhaps, contributed to our understanding of the probable cause criterion in one respect. It has helped to focus attention on the issue of *when* the probable cause must have accrued. It does not remotely mean that when an officer legitimately sees an object in plain view, the "light bulb" in the officer's head must go on instantaneously. The thinking process may be more deliberative than that, as the officer carefully forms a hypothesis, rolls the possibilities and probabilities back and forth in the chambers of the mind, ruminates, philosophizes, and ultimately concludes that, indeed, he has probable cause.

What it means, rather, is that the data-gathering process, as opposed to the conclusion-drawing process, must be completed before the justification for the valid intrusion—such as the search for guns and gunmen in *Hicks,* the frisk for weapons in *Minnesota v. Dickerson,* or the voluntary consent in the case before us—runs out. Any further and incremental intrusion beyond that point, such as the lifting of stereo equipment from a table top in *Hicks* after the search for guns had been completed or the slithering of an object through the fingers of the policeman in *Minnesota v. Dickerson* after the frisk for weapons had been completed, is invalid and cannot, therefore, serve as the prior valid intrusion necessary for a Plain View Doctrine seizure. Once the purpose of the prior intrusion has been served, the validity of that intrusion is at an end. Any additional clues, gathered thereafter, will be *per se* the products of what has by then degenerated into an invalid intrusion.

When the search for guns and gunmen had concluded in *Hicks,* the *Hicks* majority did not condemn the officers for continuing to *look* at the stereo equipment which was already in plain view; what it condemned was picking it up and looking under it, because that represented an additional invasion of privacy. The Court observed, 480 U.S. at 325, 107 S.Ct. at 1152:

Merely inspecting those parts of the turntable that came into view during the latter search would not have constituted an independent search, because it would have produced no additional invasion of respondent's privacy interest.

*Contra, State v. Wilson,* 279 Md. 189, 193–94, 367 A.2d 1223 (1977). It was the separate search or incremental intrusion that was not permitted. As the Supreme Court pointed out, 480 U.S. at 324–25, 107 S.Ct. at 1152:

> Officer Nelson's moving of the equipment, however, did constitute a "search" separate and apart from the search for the shooter, victims, and weapons that was the lawful objective of his entry into the apartment.

The data to be gathered, even though it may serve an independent purpose as probable cause for a Plain View Doctrine seizure, must come to light incidentally in the course of a prior intrusion justified for some other purpose. When the justification ceases—because that other purpose has already been served or, as in our case, because the consent is revoked—the data-gathering process, to the extent to which it entails a Fourth Amendment intrusion, must immediately cease as well. The constitutional stopwatch, however, is held on the data-gathering process, not on the police officer's thinking process. Even after the justification for the intrusion is at an end, the officer may continue to ponder, just so long as he does not commit a Fourth Amendment intrusion while pondering.

■ The time constraint on the officer's thinking process is that he must have concluded that probable cause exists before presuming to seize evidence under the Plain View Doctrine. *See State v. Wilson,* 279 Md. 189, 195, 367 A.2d 1223 (1977) ("This element [immediately apparent], in essence, amounts to a requirement that police have probable cause to believe the evidence is incriminating before they seize it."). The officer may not seize, or further search, in order to confirm suspicion. The officer may not seize, or further search, otherwise to develop probable cause. The officer may only seize after he already has probable cause. That is all that the phrase "immediately apparent" connotes. The officer must have answered, in the mind at least, the question, "Is this a dagger that I see before me, handle toward my hand?" before he

embarks upon the course of action, "Come, let me clutch thee."

This, then, is the model on which *Minnesota v. Dickerson,* 508 U.S. ——, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993), relied to build its analogue.

## B. The Plain Feel Analogue

In the *Minnesota v. Dickerson* case, two Minneapolis police officers, at about 8:15 of a November evening, were patrolling a high-crime area on the city's north side. They observed Timothy Dickerson, theretofore unknown to them, leaving a notorious "crack house," to which they had previously responded to complaints of drug sales and at which they had previously executed several search warrants for drugs. Dickerson walked nonchalantly toward where their marked squad car was parked, did a double-take worthy of Buster Keaton as he appreciated its official character, made brief eye contact with one of the officers, abruptly executed an about face, and began walking in the opposite direction. Curiosity aroused, the officers watched as Dickerson turned into an alley and then they followed.

We may take as a given, because the Minneapolis trial court, the Minnesota Court of Appeals, the Minnesota Supreme Court, and the United States Supreme Court did so, that the officers had articulable suspicion under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), for the "stop" that followed halfway down the alley. We may also take as a given, because the Minneapolis trial court, the Minnesota Court of Appeals, the Minnesota Supreme Court, and the United States Supreme Court did so, that there was also, under *Terry,* articulable suspicion for a "frisk" attendant on the stop. The frisking officer meticulously abided by the scope limitations on a frisk for weapons, as spelled out by *Terry* and by *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). That limitation, of course, is that the frisk must be confined to a pat-down of the exterior of the

clothing surface, careful and thorough, to be sure, but not intruding beneath the clothing surface, such as into a pocket.

The frisking officer executed a scrupulously limited frisk. While placing his hand against the outside of Dickerson's nylon jacket, the officer felt something through the nylon. He testified:

[A]s I pat-searched the front of his body, I felt a lump, a small lump, in the front pocket. I examined it with my fingers and it slid and it felt to be a lump of crack cocaine in cellophane.

508 U.S. at ——, 113 S.Ct. at 2133, 124 L.Ed.2d at 341.

The officer then reached into Dickerson's pocket and seized therefrom "a small plastic bag containing one fifth of one gram of crack cocaine." *Id.* Dickerson moved pretrial to suppress the cocaine. The hearing judge ruled that both the *Terry*-stop and the *Terry*-frisk were reasonable. The question for decision became the propriety of the ultimate seizure. The Supreme Court, 508 U.S. at ——, 113 S.Ct. at 2134, 124 L.Ed.2d at 342, summarized the hearing judge's decision:

[A]nalogizing to the "plain view" doctrine, under which officers may make a warrantless seizure of contraband found in plain view during a lawful search for other items, the trial court ruled that the officers' seizure of the cocaine did not violate the Fourth Amendment.

The hearing judge's analysis, quoted *verbatim* by the Supreme Court, 508 U.S. at ——, 113 S.Ct. at 2134, 124 L.Ed.2d at 342, is a model for what would ultimately be recognized by the Supreme Court:

To this Court there is no distinction as to which sensory perception the officer uses to conclude that the material is contraband. An experienced officer may rely upon his sense of smell in DWI stops or in recognizing the smell of burning marijuana in an automobile. The sound of a shotgun being racked would clearly support certain reactions by an officer. The sense of touch, grounded in experience and training, is as reliable as perceptions drawn from other

senses. "Plain feel," therefore, is no different than plain view and will equally support the seizure here.

His suppression motion having failed, Dickerson was tried and found guilty. The Minnesota Court of Appeals reversed, holding the antecedent stop and the antecedent frisk to have been reasonable but then " 'declin[ing] to adopt the plain feel exception' to the warrant requirement." 508 U.S. at ——, 113 S.Ct. at 2134, 124 L.Ed.2d 342, quoting from 469 N.W.2d 462, 466 (1991).

The Minnesota Supreme Court affirmed the Court of Appeals, 481 N.W.2d 840 (1992). It categorically rejected, as a matter of law, the theoretical possibility of a Plain Feel Doctrine. The United States Supreme Court, 508 U.S. at ——, 113 S.Ct. at 2134, 124 L.Ed.2d at 342, summarized the holding of the Minnesota high court:

> The court expressly refused "to extend the plain view doctrine to the sense of touch" on the grounds that "the sense of touch is inherently less immediate and less reliable than the sense of sight" and that "the sense of touch is far more intrusive into the personal privacy that is at the core of the [F]ourth [A]mendment." The court thus appeared to adopt a categorical rule barring the seizure of any contraband detected by an officer through the sense of touch during a patdown search for weapons. (Citation omitted.)

The Minnesota Supreme Court's second rationale for the rejection, that "the sense of touch is far more intrusive into . . . personal privacy," is a total *non-sequitur*. The intrusiveness of feeling or touching is no reason for rejecting the doctrine, because no feeling or touching will ever be done under its authority. The feeling or touching that *triggers* the doctrine, moreover, is already both reasonable and a *fait accompli* under some other rationale, such as a *Terry*-frisk or a consensual touching. Indeed, *Minnesota v. Dickerson*, 508 U.S. at ——, 113 S.Ct. at 2137–38, 124 L.Ed.2d at 346–47, pointed out the flawed logic of the Minnesota Supreme Court in that regard:

The court's second concern—that touch is more intrusive into privacy than is sight—is inapposite in light of the fact that the intrusion the court fears has already been authorized by the lawful search for weapons. The seizure of an item whose identity is already known occasions no further invasion of privacy.

In any event, the Supreme Court of the United States granted *certiorari* to determine the propriety of the Plain Feel Doctrine generally and, if it be held proper, of its applicability to the facts of the *Dickerson* case. It pointed out that five out of five of the United States Courts of Appeals to have examined the question had all recognized the validity of the Plain Feel or Plain Touch Doctrine.[4] Appellate courts from three states had also recognized the Plain Feel Doctrine,[5] while appellate courts from five other states had, like Minnesota, rejected the doctrine.[6]

In the *Minnesota v. Dickerson* opinion, it may fairly be said that the prosecutors lost the battle but won the war. The Supreme Court, citing *Michigan v. Long*, 463 U.S. 1032, 1049–50, 103 S.Ct. 3469, 3480–81, 77 L.Ed.2d 1201 (1983), initially pointed out that a frisk, even an extended frisk into an automobile, could serve as the prior valid intrusion on which to predicate a Plain View Doctrine seizure, and, by parallel logic,

---

**4.** *United States v. Coleman*, 969 F.2d 126, 132 (5th Cir.1992); *United States v. Salazar*, 945 F.2d 47, 51 (2d Cir.1991); *United States v. Buchannon*, 878 F.2d 1065, 1067 (8th Cir.1989); *United States v. Williams*, 262 U.S.App.D.C. 112, 119–24, 822 F.2d 1174, 1181–86 (1987); *United States v. Norman*, 701 F.2d 295, 297 (4th Cir.1983).

**5.** *People v. Chavers*, 33 Cal.3d 462, 471–73, 189 Cal.Rptr. 169, 175–77, 658 P.2d 96, 102–04 (1983); *Dickerson v. State*, 620 A.2d 857 (Del.Super.Ct.1993); *State v. Guy*, 172 Wis.2d 86, 101–02, 492 N.W.2d 311, 317–18 (1992).

**6.** *People v. Diaz*, 81 N.Y.2d 106, 595 N.Y.S.2d 940, 612 N.E.2d 298 (1993); *State v. Collins*, 139 Ariz. 434, 435–38, 679 P.2d 80, 81–84 (Ct.App.1983); *People v. McCarty*, 11 Ill.App.3d 421, 422, 296 N.E.2d 862, 863 (1973); *State v. Rhodes*, 788 P.2d 1380, 1381 (Okla.Crim. 1990); *State v. Broadnax*, 98 Wash.2d 289, 296–301, 654 P.2d 96, 101–03 (1982).

on which to predicate a Plain Feel Doctrine seizure. 508 U.S. at ――― ――――, 113 S.Ct. at 2136–37, 124 L.Ed.2d at 344–45.

The Supreme Court then, 508 U.S. at ――― ――――, 113 S.Ct. at 2137, 124 L.Ed.2d at 345–46, placed its *imprimatur* on the validity of the analogy between a Plain View Doctrine seizure and a Plain Feel Doctrine seizure:

> We think that this doctrine has an obvious application by analogy to cases in which an officer discovers contraband through the sense of touch during an otherwise lawful search. The rationale of the plain view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no "search" within the meaning of the Fourth Amendment—or at least no search independent of the initial intrusion that gave the officers their vantage point ... The same can be said of tactile discoveries of contraband. If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons. (Citations omitted.)

The Supreme Court, 508 U.S. at ――――, 113 S.Ct. at 2137, 124 L.Ed.2d at 346, discounted Minnesota's reasoning that a Plain Feel Doctrine must be rejected because of the inherent inferiority of the sense of touch to the sense of sight:

> *Terry* itself demonstrates that the sense of touch is capable of revealing the nature of an object with sufficient reliability to support a seizure. The very premise of *Terry*, after all, is that officers will be able to detect the presence of weapons through the sense of touch and *Terry* upheld precisely such a seizure. Even it is were true that the sense of touch is generally less reliable than the sense of sight, that only suggests that officers will less often be able to justify seizures of unseen contraband. Regardless of whether the officer detects the contraband by sight or by touch, however, the Fourth Amendment's requirement that

the officer have probable cause to believe that the item is contraband before seizing it ensures against excessively speculative seizures. (footnote omitted).

The Supreme Court also found support for that position in *Ybarra v. Illinois,* 444 U.S. 85, 93 n. 5, 100 S.Ct. 338, 343 n. 5, 62 L.Ed.2d 238 (1979), where the Court had, at least obliquely, recognized the potential for a pat-down search to yield, through the cloth of a shirt, probable cause to believe that contraband was present inside "a cigarette pack with objects in it":

> The Court's analysis does not suggest, and indeed seems inconsistent with, the existence of a categorical bar against seizures of contraband detected manually during a *Terry* patdown search.

508 U.S. at ——, 113 S.Ct. at 2137–38 n. 4, 124 L.Ed.2d at 346 n. 4.

The Supreme Court's analysis makes eminently good sense. Graduating or gauging the senses in terms of their relative reliability might be within the competence of psychologists or biologists but is not within the competence of jurists. It is not appropriate for the law, therefore, to establish a reliability hierarchy among the visual, auditory, tactile, olfactory, and salivary senses. Anecdotally, one might simplistically conclude that for the average person the sense of sight is generally more reliable than the sense of touch. Such a generalization, however, would not be reckoning with the fingers of the skilled neurosurgeon or of a Michelangelo or of any reader of Braille.

As far as constitutional law is concerned, all that matters is that enough of the multitudinous data from the outside world swim upstream to the brain of the officer to yield that critical mass we call probable cause. If the officer does not acquire enough data to constitute probable cause, he may not act in any way that requires probable cause for its justification. If, on the other hand, enough data is accumulated to produce probable cause, the law is unconcerned with which sensory avenue the data travelled, along its way to the officer's brain.

Probable cause, indeed, may be the sum total of data from several different senses. "My probable cause was based on the combination of what I touched in plain feel, smelled in plain smell, and heard in plain earshot."

■    It is clear, for instance, that plain smell alone (canine, to be sure) can yield probable cause to authorize a search warrant for a suitcase, *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), or to authorize a warrantless *Carroll* Doctrine search of a truck, *Gadson v. State*, 102 Md.App. 554, 650 A.2d 1354, filed December 28, 1994. Probable cause may be the sum total of data from one or more of the senses plus other non-sensory data, such as the knowledge in this case that the locale was an open-air drug market. The Plain View Doctrine rationale is not limited to sight but can accommodate any of the senses.

### C.   The Plain Feel Doctrine as Applied in Dickerson

With Supreme Court approval of the abstract proposition that there can be Plain Feel Doctrine warrantless seizures, the prosecution won the war. Applying that doctrine, however, to the facts of the *Minnesota v. Dickerson* case, the prosecution lost the battle.

The first criterion—that of a prior valid intrusion—was satisfied. To run one's fingers or palms down someone's rib cage is, to be sure, a Fourth Amendment intrusion, just as surely as is the crossing of the threshold into someone's home. If, however, it is justified, as a *Terry*-frisk for weapons, for instance, it is a *valid* intrusion. The frisk was valid in *Dickerson*.

The second criterion—feeling something, to wit, a small lump in the front pocket—was also satisfied. The frisk for weapons was still validly in progress when the officer felt the small lump. It was only when the officer realized that the small lump was not a weapon that any further intrusion with respect to that pocket became unreasonable.

It was the third criterion—probable cause to believe that the small lump validly felt was contraband or other evidence of

crime—that was the frisking officer's undoing. It was only after the officer had already concluded that there was no weapon in that pocket, to wit, after the justifiable intrusion onto that part of Dickerson's torso had come to an end, that additional slithering and sliding of the small lump between the officer's fingers led to the probable cause that the lump was crack cocaine. A critical part of the data-gathering came after time had expired. Data gathered after the final whistle blows does not count. The United States Supreme Court summarized, 508 U.S. at ——, 113 S.Ct. at 2138, 124 L.Ed.2d at 347, the conclusion of the Minnesota Supreme Court in that regard:

Rather, the court concluded, the officer determined that the lump was contraband only after "squeezing, sliding and otherwise manipulating the contents of the defendant's pocket"—a pocket which the officer already knew contained no weapon.

Time having run on the frisk, the last necessary increment to the establishment of probable cause was the improperly gathered product of an *invalid* intrusion:

Although the officer was lawfully in a position to feel the lump in respondent's pocket, because *Terry* entitled him to place his hands upon respondent's jacket, the court below determined that the incriminating character of the object was not immediately apparent to him. Rather, *the officer determined that the item was contraband only after conducting a further search,* one not authorized by *Terry* or by any other exception to the warrant requirement. Because this further search of respondent's pocket was constitutionally invalid, the seizure of the cocaine that followed is likewise unconstitutional. (Emphasis supplied.)

508 U.S. at ——, 113 S.Ct. at 2139, 124 L.Ed.2d at 348.

### V. *The Plain Feel Doctrine In This Case*

As with *Minnesota v. Dickerson,* the first two criteria for a Plain Feel Doctrine seizure pose no problem in the case before us. Officer Ottey's hand against the outside of Jones's left

front pants pocket was a valid intrusion, the product of what was found to be voluntary consent. Indeed, Jones's consent to Officer Ottey's "checking" of him not just for guns but also for drugs could reasonably have been interpreted by the officer to include consent to go *into* the pockets. That possibly broader scope to the consensual search, however, is immaterial. Whether he could have done so or not, Officer Ottey never, during the period of valid consent, actually went into Jones's pocket. During the course of the valid intrusion, Officer Ottey then felt something in plain touch—"numerous rock-like substances"—as he squeezed the bulge in the pocket before Jones called time on him by revoking consent. The first two criteria were satisfied.

It is the third criterion for a valid Plain Feel Doctrine seizure that is the critical issue before us—probable cause to believe that the "numerous rock-like substances" were crack cocaine. There was not, as in *Minnesota v. Dickerson* or *Arizona v. Hicks*, any problem here as to a further or incremental search after time was called. The issue is simply whether Officer Ottey had probable cause before he, post the revocation of consent, thrust his hand into Jones's pocket and seized the crack cocaine. Our concerns are: "What did Officer Ottey know?" and "When did he know it?"

Judge Thieme was not persuaded that the officer possessed that necessary probable cause. The State is asking us to reverse that finding.

### VI. Levels of Abstraction in Fact Finding

The standard of appellate review we must apply to Judge Thieme's finding of no probable cause will depend, in significant measure, on the essential nature of such fact finding.

Appellate review of fact finding takes two forms. Generally, it is highly deferential to the *nisi prius* determination and will not reverse findings of fact unless they are "clearly erroneous." The primary, but not the only, reason for such deference is because of the superior vantage point of the *nisi prius* fact finder (judge or jury) to observe the witnesses, to

receive the immense benefit of non-verbal as well as verbal communication, to assess credibility, and to weigh evidence. As we observed in a related context in *Wenger v. Wenger,* 42 Md.App. 596, 604, 402 A.2d 94 (1979):

> This is based upon the sound principle that the [fact finder] saw and heard the witnesses and was able to make the subtle judgments based upon appearance, upon tone of voice, upon even non-verbal communication, etc. that are never available upon the pages of a transcript as perused after the fact ... by ... an appellate court upon later review. (footnote omitted).

The reason for appellate deference is broader, however, than the ability of the fact finder to observe the witnesses. An appellate court is required to be deferential to a trial court even on a set of undisputed facts, such as a written stipulation of facts. In *Danz v. Schafer,* 47 Md.App. 51, 422 A.2d 1 (1980), the trial judge, on an agreed statement of facts, drew one of two permitted inferences. This Court, expressly stating that if it had been making a *de novo* determination it would have drawn the opposite inference, nonetheless applied the "clearly erroneous" standard and affirmed. We explained, 47 Md.App. at 62–63, 422 A.2d 1, why we used the highly deferential standard:

> The taproot of analysis is that the deference paid by the appellate reviewing court to the fact finding and evidence-based verdict rendering of a trial judge unless he is clearly erroneous, is not predicated upon the fact that he alone saw the witnesses and observed their demeanor. That is a peripheral characteristic, not a cause. The deference is not even predicated upon the additional factor that the trial court "is not only the judge of a witness' credibility, but is also the judge of the weight to attach to the evidence." *Knowles v. Binford,* 268 Md. 2, 298 A.2d 862 [1973]. The deference rather rests fundamentally upon the core difference between the trial function and the appellate function. One is to decide cases; the other is to screen out trial error. (footnote omitted).

The Supreme Court concurs that the deference paid by an appellate court to a *nisi prius* decision is based on more than the ability of the *nisi prius* court to observe witnesses and to resolve disputed credibilities: *Anderson v. Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518, 528 (1985), observed:

If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts.* (citations omitted) (Emphasis supplied.)

*See also Commissioner v. Duberstein,* 363 U.S. 278, 291, 80 S.Ct. 1190, 1199–1200, 4 L.Ed.2d 1218, 1228 (1960).

There is also, however, a very different and non-deferential standard of appellate review of fact finding. It charges the appellate judges with the obligation to make, *de novo,* their own independent decisions as to the ultimate fact for determination, sometimes called the conclusory fact and sometimes called a mixed question of law and fact.

A very significant factor in determining which standard of appellate review should be employed is the level of abstraction of the fact finding under review. Maryland's first effort at analyzing different levels of abstraction in fact finding came in *Walker v. State,* 12 Md.App. 684, 280 A.2d 260 (1971). We sought, 12 Md.App. at 695, 280 A.2d 260, to distinguish findings of "specific, first-level facts" from findings of "ultimate, second-level facts":

[A]lthough we give great weight to the findings of the hearing judge as to specific, first-level facts (such as the time that an interrogation began, whether a meal was or was not served, whether a telephone call was requested,

etc.) we must make our own independent judgment, resolve for ourselves the ultimate, second-level fact—the existence or non-existence of voluntariness.

In *Wenger v. Wenger*, 42 Md.App. 596, 607, 402 A.2d 94 (1979), we again distinguished between findings of "first-level facts" and findings of "more abstract, second-level, conclusory or dispositional facts":

In this regard, he confuses first-level facts with more abstract, second-level, conclusory or dispositional facts. A chancellor may defer to the master on such first-level facts as that a husband makes $50,000 a year; the yearly orthodontia bill is $1,500; the rent is $300 a month; the bank account of thus and so is thus and so. On the other hand, such second-level, conclusory "facts" as the wife's ultimate need or the husband's ultimate ability to pay are dispositional in nature and are the ultimate province of the chancellor.

In retrospect, a more precise linguistic distinction, one that would have been less vulnerable to misapplication, might have been a distinction not between "first-level" and "second-level" fact finding but one between fact finding at "a lower level of abstraction" and fact finding at "a higher level of abstraction." In *Domingues v. Johnson*, 323 Md. 486, 593 A.2d 1133 (1991), Judge McAuliffe for the Court of Appeals pointed out that there are, of course, not just two levels but numerous levels of abstraction in fact finding. He pointed out, 323 Md. at 494, 593 A.2d 1133:

A finding that A shot B is rather easily identified as a finding of fact. A finding that A intentionally shot B is also a finding of fact, even though the ultimate fact may have been found by the use of inferences drawn from other known facts. A finding that a witness did not testify truthfully is a finding of fact that a master may make, even though it is to some extent an opinion or conclusion, often drawn from a variety of observations and inferences. Moreover, perception of the character of any given statement may vary depending upon the form in which it appears. Compare, "I find as a fact the witness testified falsely," with

"In my opinion, the witness testified falsely," or "I conclude that the witness testified falsely."

In *Domingues,* Judge McAuliffe sought to illustrate the plurality of the levels of abstraction in fact finding by analogizing them to the testimonial levels of abstraction involved in the "fact" versus "opinion" controversy raised by the Public–Records exception to the Hearsay Rule under Federal Rule of Evidence 803(8)(c). *Domingues* quoted from *Ellsworth v. Sherne Lingerie, Inc.,* 303 Md. 581, 609, 495 A.2d 348 (1985), which had discussed the frequently blurred line between "fact" and "opinion":

The line between "fact" and "opinion" is often difficult to draw. An investigating body may hear diametrically opposed testimony on the question of whether one person or another struck the first blow, and proceed to decide the issue as a finding of "fact." That determination necessarily has a judgmental quality, and differs, for example, from a finding of fact that a certain number of persons suffered burns from ignition of clothing fabric during a given period. Conclusions found in reports need not be judgmental. A conclusion that there has been a significant increase in fabric-related burn injuries is essentially factual if the datum shows a 60% increase. Thus, attaching labels of "fact" or "opinion" or "conclusion" will not necessarily resolve the issue, and careful attention must be given to the true nature of the statement and the totality of circumstances bearing on the ultimate issue of reliability.

*Domingues* also quoted with approval *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 168, 109 S.Ct. 439, 449, 102 L.Ed.2d 445 (1988), as it, in turn, quoted with approval W. King & D. Pillinger, *Opinion Evidence in Illinois* 4 (1942):

"All statements in language are statements of opinion, i.e., statements of mental processes or perceptions. So-called 'statements of fact' are only more specific statements of opinion. What the judge means to say, when he asks the witness to state the facts, is: 'The nature of this case

requires that you be more specific, if you can, in your description of what you saw.' "

An opinion is a more abstract conclusion of fact than a straight description of something directly observed. Almost everything, however, is at one level or another a matter of opinion. See E. Cleary, *McCormick on Evidence* 27 (3rd ed. 1984) ("There is no conceivable statement however specific, detailed and 'factual,' that is not in some measure the product of inference and reflection as well as observation and memory"); R. Lempert & S. Saltzburg, *A Modern Approach to Evidence* 449 (2d ed. 1982) ("A factual finding, unless it is a simple report of something observed, is an opinion as to what more basic facts apply"). Lempert and Salzburg raise the question whether the report of a building inspector that a house is in violation of the building code is a fact or an opinion when the report says, "Because of its cracked foundation, leaking roof and rusting furnace, the house ... is in violation of the building code." *Id.*

The almost imperceptible progression from "fact" to "opinion," like the analogous progression from less abstract fact finding to more abstract fact finding, has been well described by E. Cleary, *McCormick on Evidence* 27 (3rd ed. 1984):

The difference between the statement, "He was driving on the left-hand side of the road" which would be classed as "fact" under the rule, and "He was driving carelessly" which would be called "opinion" is merely a difference between a more concrete and specific form of descriptive statement and a less specific and concrete form. The difference between so-called "fact," then, and "opinion," is not a difference between opposites or contrasting absolutes, but a mere difference in degree with no recognizable line to mark the boundary.

If trial judges are given the task of distinguishing on the spur of the moment between "fact" and "opinion," no two judges, acting independently, can be expected to reach the same results on the same questions. (footnote omitted).

Mark McCormick, *Opinion Evidence in Iowa*, 19 Drake L.Rev. 245, 247 (1970), commented on the same imperceptible slide along an unbroken continuum:

[W]hat comes through the senses makes an impression on the mind. This is perception. However, voicing that perception necessarily assumes a process of reasoning. What are recited as facts are some aspects of reality grasped by imperfect senses and filtered through imperfect intellects.... What is fact and what is inference is necessarily a matter of degree and there are no sharp lines of distinction. (footnote omitted).

In that article, Judge McCormick concluded, at 246:

The rule against opinions is best understood as a rule of preference which favors the concrete over the abstract. Like the hearsay and original documents rules, it is a "best evidence" rule. It assumes that testimony which is limited to recital of facts from the actual observation of the witness is generally more reliable than his testimonial inferences, conclusions and opinions. (footnotes omitted).

Any tension, however, between *Domingues v. Johnson*, on the one hand, and *Wenger v. Wenger* and *Walker v. State*, on the other hand, is more apparent than real. Indeed, *Domingues*'s quarrel was not so much with *Wenger*'s distinction between first-level fact finding and second-level fact finding as it was with the particular application of *Wenger* in our *Johnson v. Domingues*, 82 Md.App. 128, 570 A.2d 369 (1990), as we may have placed some first-level fact finding erroneously into the category of second-level fact finding.

To be sure, there are, as *Domingues* suggests and as the analogy to the "fact" versus "opinion" controversy confirms, far more than two levels of fact finding. So seemingly concrete a finding of fact as that the weather was wintry may be a conclusory fact drawn from such more specific findings as that the air was cold, there was snow on the ground, and there were no leaves on the trees. Even a finding that the air was cold may be a conclusion drawn from the observer's goose pimples, red skin, and shivering. The finding of fact that "A

and B agreed" is, in a sense, a conclusion drawn from the more concrete fact findings that "A said x" and "B said y." The finding of fact that "A was unconscious" is, in a sense, a conclusion drawn from the more concrete fact findings that "A was prostrate," "A was silent," and "A did not open his eyes."

Before getting to such conclusory findings of fact as that the confession was involuntary or the movie is obscene, the fact finder may have to ascend through a dozen levels of escalating abstraction. The higher the level of abstraction, the more the fact finding approaches the status of being conclusory.

There are, however, only two levels of appellate review of fact finding. What *Walker v. State* and *Wenger v. Wenger* were, therefore, connoting by "first-level factfinding" is that level—or all those levels—of fact finding that do not resolve legal issues in the case and that are, therefore, indisputably eligible for the "clearly erroneous" standard of review. Conversely, "second-level factfinding" connotes that conclusory or dispositional fact finding that has ultimate legal significance— the mixed question of law and fact—obscenity, voluntariness of a confession, voluntariness of consent, exigency, probable cause.

First-level fact finding, thus defined, will always be subject to the deferential "clearly erroneous" standard of appellate review. Second-level fact finding, thus defined, may, depending on other considerations, also be subject to the "clearly erroneous" review standard or it may be subject to *de novo* appellate determination.

A finding of probable cause is a second-level determination of a conclusory, dispositional, mixed question of law and fact. Merely locating the finding under review at that rung on the abstraction ladder, however, does not provide us the answer we seek. What then are the other considerations that will decide between the "clearly erroneous" and the *de novo* standards of review?

### VII.  *Probable Cause in a Warrant Setting*

The fact that a probable cause determination by a warrant-issuing judge must be reviewed by an appellate court, by a

trial judge, and by a suppression hearing judge alike by a highly deferential standard of review [7] is not one of those considerations. The review of a search warrant is doctrinally *sui generis* and has no persuasive impact on the question of appellate review of probable cause rulings in a warrantless context.

The law is well settled that, when the issue being reviewed is the existence of probable cause for the issuance of a warrant, the reviewing court may *not* make a *de novo* determination but must extend great deference in that regard to the warrant-issuing magistrate. In *State v. Amerman*, 84 Md.App. 461, 467–68, 581 A.2d 19 (1990), we discussed the express resolution of that issue by *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). "Whatever lingering doubt may have existed prior to 1983 about the standard of review to be applied to a magistrate's decision to issue a warrant, that doubt was resolved by *Illinois v. Gates*. . . . Consistently and repeatedly, the object of the review was

---

7.  Indeed, when the probable cause review takes the form of reviewing the issuance of a search warrant or an arrest warrant, the standard of review is *even more deferential* than the "clearly erroneous" standard. *State v. Amerman*, 84 Md.App. 461, 472–73, 581 A.2d 19 (1990), discussed at length this even more deferential standard. In the course of that discussion, it observed:

    The "substantial basis" standard is less demanding than even the familiar "clearly erroneous" standard by which appellate courts review judicial fact finding in a trial setting. . . .

    [W]hile the "clearly erroneous" test demands some legally sufficient evidence for each and every element to be proved—to wit, that a *prima facie* case be established—*Illinois v. Gates* rejected such a rigorous standard for establishing probable cause and opted instead for a "totality of circumstances" approach wherein an excess of evidence as to one aspect of proof may make up for a deficit as to another. *Illinois v. Gates* expressly stated, 462 U.S. at 235, 103 S.Ct. at 2330, that a legally sufficient or *prima facie* showing is not required:

    [I]t is clear that "only the probability, *and not a prima facie showing*, of criminal activity is the standard of probable cause." (emphasis supplied).

    *See also Birchead v. State*, 317 Md. 691, 701, 566 A.2d 488 (1989); *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 745–46, 13 L.Ed.2d 684 (1965).

stated to be *the magistrate's decision.*" (emphasis in original). The Supreme Court, 462 U.S. at 236, 103 S.Ct. at 2331, was emphatic:

> [W]e have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's "determination of probable cause should be paid great deference by reviewing courts."

The Supreme Court, 462 U.S. at 238–39, 103 S.Ct. at 2332–33, spelled out respectively 1) "the task of the issuing magistrate" and 2) "the duty of a reviewing court":

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.

The acid test, according to *Illinois v. Gates*, is not whether the reviewing court would find probable cause but whether the magistrate had a substantial basis for doing so:

> Reflecting this preference for the warrant process, the traditional standard for review of an issuing magistrate's probable-cause determination has been that *so long as the magistrate had a "substantial basis for ... conclud[ing]"* that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more. (Emphasis supplied.)

462 U.S. at 236, 103 S.Ct. at 2331.

One year later, in *Massachusetts v. Upton,* 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984), the Supreme Court upbraided the Supreme Judicial Court of Massachusetts for having been too demanding in its scrutiny of the magistrate's decision. It reiterated what *Illinois v. Gates* had said about the appropriate standard of review, making it very clear that

finding a substantial basis for what the magistrate did is something less than finding the existence of probable cause:

> We also emphasized that the task of a reviewing court *is not* to conduct a *de novo* determination of probable-cause, *but only* to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant. (Emphasis supplied.)

466 U.S. at 728, 104 S.Ct. at 2085. The *Upton* Court restressed, 466 U.S. at 732–33, 104 S.Ct. at 2088, the significant conceptual difference between the two standards:

> The Supreme Judicial Court also erred in failing to grant any deference to the decision of the Magistrate to issue a warrant. Instead of merely deciding whether the evidence viewed as a whole provided a "substantial basis" for the Magistrate's finding of probable cause, the court conducted a *de novo* probable-cause determination. We rejected just such after-the-fact, *de novo* scrutiny in *Gates*.

The Court of Appeals in *Potts v. State*, 300 Md. 567, 479 A.2d 1335 (1984), explicitly adopted the Supreme Court's holding as to the appropriate standard of review. "After-the-fact judicial scrutiny of the affidavit should not take the form of *de novo* review." 300 Md. at 572, 479 A.2d 1335. Chief Judge Murphy reasoned for the Court, 300 Md. at 575, 479 A.2d 1335:

> Under the totality of the circumstances analysis explicated by *Gates* and *Upton*, and giving the magistrate's determination the great deference mandated by those cases, we hold that there was a substantial basis upon which the magistrate could have found that a search of Potts' residence would uncover illegal narcotics; hence, the issuance of the warrant did not violate the Fourth Amendment.

Again speaking through Chief Judge Murphy in *Birchead v. State*, 317 Md. 691, 701, 566 A.2d 488 (1989), the Court of Appeals reconfirmed that deferential standard for reviewing a magistrate's probable cause determination:

> Our review of the judge's decision to issue the search warrants is limited to whether there was a substantial basis

for concluding that the evidence sought would be discovered in the place described in the application for the warrant. . . . Moreover, we generally pay great deference to a magistrate's determination of probable cause. (Citation omitted.) *See also Malcolm v. State*, 314 Md. 221, 229, 550 A.2d 670 (1988) ("[T]he defendant must overcome the presumption of regularity attending a search warrant"); *Thompson v. State*, 62 Md.App. 190, 206–07, 488 A.2d 995, *cert. denied*, 303 Md. 471, 494 A.2d 939 (1985).

Notwithstanding that substantial body of law holding that reviewing courts should refrain from anything approaching a *de novo* standard of review when looking at probable cause determinations in a warrant setting, that law has no bearing on the very different question of what the standard of review should be when looking at probable cause determinations in a warrantless setting. The reason why the case law lacks any persuasive weight is because it was formulated in the express service of the policy of encouraging resort to warrants. That policy does not come into play, by definition, in a warrantless context.

In the seminal decision of *Illinois v. Gates* itself, the Supreme Court explained, 462 U.S. at 236, 103 S.Ct. at 2331, that one of the strong reasons for extending "great deference" to the magistrate's decision to issue a warrant is to encourage the police to submit to the warrant process:

"A grudging or negative attitude by reviewing courts toward warrants," [*U.S. v.*] *Ventresca*, is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; "courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner."

If the affidavits submitted by police officers are subjected to the type of scrutiny some courts have deemed appropriate, police might well resort to warrantless searches, with the hope of relying on consent or some other exception to the Warrant Clause that might develop at the time of the search. (Citation omitted.)

In *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965), the Supreme Court admonished reviewing courts to "call the close plays" in favor of the magistrate's decision to issue the warrant:

Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.

As we have said, there is no such policy consideration affecting the choice of a review standard for probable cause determinations in a warrantless setting. The experience of the courts in reviewing probable cause in the warrant context, however, does illustrate two things. It shows us first that it is by no means chiseled in marble that probable cause decisions must be subjected to *de novo* review. It is a type of issue that could theoretically be reviewed either way and the "clearly erroneous" standard, though it may ultimately be rejected, should not be rejected summarily or uncritically.

This experience in handling warrant review also illustrates that a more deferential review standard can reasonably accommodate the probable cause issue. If, indeed, the proper mission of appellate review is not to do ultimate justice in the world by actually settling real issues but rather to monitor the operation of the judicial machinery by screening for trial error, the approach to probable cause in the warrant setting described by *State v. Amerman,* 84 Md.App. 461, 463, 581 A.2d 19 (1990), might with equal validity be applied to probable cause determinations in the warrantless setting:

Probable cause does not suddenly spring to life at some fixed point along the probability continuum. It may arise at any number of points within a band of not insignificant width. Within that range of legitimate possibilities, the determination is as much an art form as a mathematical exercise and relies necessarily upon the eye of the beholder. One judge may give a circumstance great weight; another may give it slight weight; each is entitled to weigh for

himself and neither will be legally wrong in so doing. Within proper limits, one judge may choose to draw a reasonable inference; another may as readily decline the inference; each will be correct and each is entitled, therefore, to the endorsement of a reviewing colleague. A permitted inference, after all, is not a compelled inference. (footnote omitted).[8]

That approach, to be sure, would be in the service of a different policy, the pursuit of judicial restraint in defining the proper appellate function. In any event, to appreciate that the "clearly erroneous" standard, or some other deferential standard, *could* be utilized in the warrantless setting is not, of course, to determine that it *should* be. As we walk through the analysis, that question, for the moment, remains open. Thus, the non-analogous handling of probable cause in a warrant setting does not provide us the answer we seek.

### VIII. Mixed Questions of Law and Fact Can Go Either Way

■ To determine, as we have here, that the finding being reviewed is a conclusory finding, a dispositional finding, a mixed finding of law and fact, is not, *ipso facto*, to determine its appropriate standard of appellate review. There are many mixed questions of law and fact and the mixtures are by no means the same. Some mixed questions of law and fact are

---

**8.** As pointed out in *State v. Amerman*, 84 Md.App. 461, 464 n. 2, 581 A.2d 19 (1990), the same appellate-like discipline, carried to its logical limit, could constrain a suppression hearing judge even when reviewing his own earlier issuance of a warrant, as he may do under *Trussell v. State*, 67 Md.App. 23, 25–29, 506 A.2d 255 (1986), *cert. denied*, 306 Md. 514, 510 A.2d 260 (1986):

Although I would not, as a matter of fact, find probable cause from these circumstances today, I cannot say, as a matter of law, that I was legally in error when I did so yesterday. I, therefore, have no choice at this juncture and in this more confining capacity but to uphold my earlier warrant, although I am frank to admit that I would not reissue it.

There is no reason why the same judge should not react to the same set of facts one way with the right hemisphere of his brain, as a sensate fact finder, and a very different way with the left hemisphere of his brain, as a legal referee.

heavier in their fact component; others are heavier in their law component. The choice of an appellate review standard is made, therefore, not categorically but on an *ad hoc* basis. Generally speaking, those mixed questions that have a heavier factual component are subjected to "clearly erroneous" review, while those questions that have a heavier legal component are subjected to *de novo* determination.

A number of mixed questions of law and fact—particularly questions involving constitutional issues—have been determined properly to be the subject of *de novo* review, sometimes referred to as independent, reflective constitutional judgment. The Supreme Court has traditionally handled the obscenity issue in that fashion, as has Maryland. *Jacobellis v. Ohio,* 378 U.S. 184, 187–88, 84 S.Ct. 1676, 1677–78, 12 L.Ed.2d 793 (1964). *And see Sanza v. Maryland Board of Censors,* 245 Md. 319, 330, 226 A.2d 317 (1967); *Donnenberg v. State,* 1 Md.App. 591, 599, 232 A.2d 264 (1967); *Dillingham v. State,* 9 Md.App. 669, 710–14, 267 A.2d 777, *cert. denied,* 259 Md. 731 (1970) (concurring opinion by Orth, J.).

The Supreme Court has also regularly reviewed constitutional challenges to the voluntariness of confessions on a *de novo* basis. *Stein v. New York,* 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953); *Blackburn v. Alabama,* 361 U.S. 199, 205 n. 5, 80 S.Ct. 274, 279 n. 5, 4 L.Ed.2d 242 (1960); *Haynes v. Washington,* 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); *Davis v. North Carolina,* 384 U.S. 737, 741–42, 86 S.Ct. 1761, 1764–65, 16 L.Ed.2d 895 (1966).[9] *See also Barn-*

---

9. As purely academic authority on appropriate appellate review standards, this body of case law must be slightly discounted. An activist Supreme Court was expanding its jurisdiction at the expense of recalcitrant states and could not permit clever or manipulative fact finding to frustrate its larger agenda. As stated in *Stein v. New York,* 346 U.S. 156, 181–82, 73 S.Ct. 1077, 1091, 97 L.Ed. 1522 (1953):

[T]his Court cannot allow itself to be completely bound by state court determinations of any issue essential to decisions of a claim of federal right, else federal law could be frustrated by distorted fact finding.... It is only miscarriages of such gravity and magnitude that they cannot be expected to happen in any enlightened system of justice, or be tolerated by it if they do, that cause us to intervene *to*

*hart v. State,* 5 Md.App. 222, 224, 246 A.2d 280 (1968); *Dennis v. Warden,* 6 Md.App. 295, 315, 251 A.2d 909, *cert. denied,* 255 Md. 740 (1969); *Gardner v. State,* 10 Md.App. 233, 245, 269 A.2d 186 (1970); *Mulligan v. State,* 10 Md.App. 429, 431 n. 1, 271 A.2d 385 (1970).

As a logical extension of the application of the *de novo* standard to reviews of the voluntariness of confessions, several decisions of the Court of Appeals and of this Court have similarly applied that standard to review of the indistinguishable voluntariness of Fourth Amendment consent. *State v. Wilson,* 279 Md. 189, 202, 367 A.2d 1223 (1977); *Gamble v. State,* 318 Md. 120, 128, 567 A.2d 95 (1989); *Borgen v. State,* 58 Md.App. 61, 78–80, 472 A.2d 114 (1984); *Perkins v. State,* 83 Md.App. 341, 346–47, 574 A.2d 356 (1990).

*Aiken v. State,* 101 Md.App. 557, 563, 647 A.2d 1229 (1994), was an omnibus application of the *de novo* review standard, as it applied that standard to determinations of 1) both articulable suspicion for a *Terry*-stop and probable cause for a warrantless arrest, 101 Md. at 563, 567–68, 647 A.2d 1229; 2) probable cause for a Plain View Doctrine seizure, 101 Md.App. at 563, 570, 647 A.2d 1229; and 3) the impermissible suggestiveness of a photographic identification, 101 Md.App. at 563, 572–73, 647 A.2d 1229.

After years of subjecting decisions coming from state courts to independent, reflective, constitutional review, in part at least to prevent the states from thwarting federal review by clever or "distorted" fact finding, the Supreme Court in recent years has shown a tendency to draw back and to apply the deferential "clearly erroneous" standard of review even to certain questions of constitutional dimension. Perhaps the shift can be explained in terms of the difference between the

---

*review,* in the name of the Federal Constitution, *the weight of conflicting evidence* to support a decision by a state court. (Emphasis supplied.)

There is a discernible political agenda involved in such statements. *See also Haynes v. Washington,* 373 U.S. 503, 515–16, 83 S.Ct. 1336, 1344–45, 10 L.Ed.2d 513 (1963).

judicial activism of the 1950's and 1960's and the judicial restraint of the 1980's and 1990's. In any event, there has been a sea change.

Although it may be explained in terms of extrinsic policy, there is now, as has been discussed, the extremely deferential standard being applied to probable cause determinations by warrant-issuing magistrates. *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Massachusetts v. Upton,* 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984).

In *Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), the issue was whether peremptory challenges had been unconstitutionally exercised in a racially discriminatory way in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The prosecutor had struck several Latinos or Hispanics from the jury. The Supreme Court acknowledged that the prosecutor's ground for excusing the jurors, relating as it did to their ability to speak and understand Spanish, "raised a plausible, though not a necessary inference that language might be a pretext for what was in fact race-based peremptory challenges." 500 U.S. at 363, 111 S.Ct. at 1868, 114 L.Ed.2d at 408. The trial judge, however, "chose to believe the prosecutor's race-neutral explanation for striking the two jurors in question." *Id.*

The Supreme Court held that even though the issue was ultimately dispositive of the appeal and even though it resolved a constitutional question, it was predominantly an issue of fact, the resolution of which depended upon the trial judge's assessment of the prosecutor's credibility. The Supreme Court applied the "clearly erroneous" standard and affirmed the decision of the trial judge.

*Hernandez v. New York* lays to rest the notion that an issue must be the subject of *de novo* review simply because it involves a constitutional question. The Supreme Court, 500 U.S. at 366, 111 S.Ct. at 1870, 114 L.Ed.2d at 410, was emphatic in this regard:

Our cases have indicated that, in the absence of exceptional circumstances, we would defer to state court factual find-

ings, *even when those findings relate to a constitutional issue.* Moreover, *"an issue does not lose its factual character merely because its resolution is dispositive of the ultimate constitutional question."* (citations omitted) (Emphasis supplied.)

Just as *Hernandez v. New York* established that an issue is not entitled to a *de novo* appellate determination just because it involves a constitutional question, *Pullman–Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), established that an issue is not entitled to a *de novo* appellate determination just because it is a finding of an ultimate or dispositive fact in the case.

The plaintiffs, a group of black employees, sued the Pullman–Standard Corporation, alleging that its seniority system violated Title VII's guarantee of equal employment opportunity. Although the seniority system did have an adverse impact on the plaintiffs as a group, it was the finding of fact by the District Court that the seniority system was "not the result of an intention to discriminate" because of race or color. Because of that finding, the defendant corporation was ruled to be not in violation of Title VII.

The United States Court of Appeals for the Fifth Circuit reversed the District Court's judgment. It held that although Federal Rule of Civil Procedure 52(a) dictates that findings of fact shall not be reversed unless "clearly erroneous," the deferential standard of review was nonetheless not mandated because the finding of discrimination or non-discrimination involved was "a finding of ultimate fact." The Fifth Circuit held in this regard:

Although discrimination *vel non* is essentially a question of fact it is, at the same time, *the ultimate issue for resolution in this case,* being expressly proscribed by 42 USCA § 2000e–2(a). As such, a finding of discrimination or non-discrimination is *a finding of ultimate fact.* In reviewing the district court's findings, therefore, *we will proceed to make an independent determination* of appellant's allegations of discrimination, though bound by findings of subsid-

iary fact which are themselves not clearly erroneous. (citations omitted) (Emphasis supplied.)

*Swint v. Pullman–Standard,* 624 F.2d 525, 533 n. 6 (1980).

The Fifth Circuit then proceeded to make its own independent findings with respect to discrimination. The Supreme Court reversed the Fifth Circuit for its failure to apply the more deferential "clearly erroneous" standard of review to the District Court's determination. It held, 456 U.S. at 287, 102 S.Ct. at 1789, that the "clearly erroneous" standard applies with equal force to findings of "ultimate fact" and findings of "subsidiary fact":

> Rule 52(a) broadly requires that findings of fact not be set aside unless clearly erroneous. It does not make exceptions or purport to exclude certain categories of factual findings from the obligation of a court of appeals to accept a district court's findings unless clearly erroneous. *It does not divide facts into categories; in particular, it does not divide findings of fact into those that deal with "ultimate" and those that deal with "subsidiary" facts.* (Emphasis supplied.)

The Supreme Court recognized that the "clearly erroneous" standard does not apply to conclusions of law, but pointed out that the District Court's finding of non-discriminatory intent did not rest on an erroneous view of the law. The Fifth Circuit, indeed, did not claim that the District Court had misunderstood the law or had applied an erroneous definition of it. It had simply faulted the District Court for having concluded that the evidence did not amount to intentional discrimination. The Supreme Court, 456 U.S. at 287–88, 102 S.Ct. at 1789, pointed out that such a determination by the District Court was factual and not legal in nature and, therefore, was subject to "clearly erroneous" review:

> But here the District Court was not faulted for misunderstanding or applying an erroneous definition of intentional discrimination. It was reversed for arriving at what the Court of Appeals thought was an erroneous finding as to whether the differential impact of the seniority system reflected an intent to discriminate on account of race. That

question, as we see it, is a pure question of fact, subject to Rule 52(a)'s clearly-erroneous standard. It is not a question of law and not a mixed question of law and fact.

*Rogers v. Lodge,* 458 U.S. 613, 622–23, 102 S.Ct. 3272, 3278, 73 L.Ed.2d 1012, 1021 (1982), reaffirmed *Pullman–Standard v. Swint*'s commitment to the "clearly erroneous" standard for fact finding as broadly defined:

> Our recent decision in *Pullman–Standard v. Swint* emphasizes the deference Federal Rule of Civil Procedure 52 requires reviewing courts to give a trial court's findings of fact. "Rule 52(a) broadly requires that findings of fact not be set aside unless clearly erroneous. It does not make exceptions or purport to exclude certain categories of factual findings. . . ." The Court held that the issue of whether the differential impact of a seniority system resulted from an intent to discriminate on racial grounds "is a pure question of fact, subject to Rule 52(a)'s clearly-erroneous standard." (Citation omitted.)

The ultimate and constitutional issue being reviewed was the finding by the District Court that a county's system of at-large elections in Georgia violated the constitutional rights of the county's black citizens by diluting their voting power. The Supreme Court, 458 U.S. at 623, 102 S.Ct. at 3278, treated the matter as a factual finding entitled to "clearly erroneous" review:

> The *Swint* Court also noted that issues of intent are commonly treated as factual matters. We are of the view that the same clearly-erroneous standard applies to the trial court's finding in this case that the at-large system in Burke County is being maintained for discriminatory purposes, as well as to the court's subsidiary findings of fact. (Citation omitted.)

In *Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), the critical constitutional issue was whether the Double Jeopardy Clause barred a retrial because the defendant's request for a mistrial had allegedly been caused by prosecutorial overreaching. The trial court judge found

that it had not, but the Oregon Court of Appeals reversed. 49 Or.App. 415, 619 P.2d 948. The Supreme Court reversed the Court of Appeals, holding that the issue of prosecutorial intent was quintessentially factual and should have enjoyed appropriately deferential treatment at the hands of the Court of Appeals.

What the Supreme Court decisions leave us with is the fact that *de novo* review is not automatically mandated by the status of the finding being reviewed as ultimate, conclusory, dispositional, or constitutional. The only distinction that seems to matter is that between fact and law. In a very real sense, the Supreme Court has dodged the problem of what to do with a mixed question of fact and law. It did this in *Hernandez v. New York,* 500 U.S. at 367, 111 S.Ct. at 1870, by treating the prosecutor's intent in exercising a peremptory challenge as exclusively a question of fact:

> [I]f an appellate court accepts a trial court's finding that a prosecutor's race-neutral explanation for his peremptory challenges should be believed, we fail to see how the appellate court nevertheless could find discrimination. The credibility of the prosecutor's explanation goes to the heart of the equal protection analysis, and once that has been settled, there seems nothing left to review.

It may have stretched even further in *Pullman–Standard v. Swint,* 456 U.S. at 289, 102 S.Ct. at 1790, by treating the broad intent of a corporation's seniority system as exclusively a question of fact:

> [D]iscriminatory intent is a finding of fact to be made by the trial court; it is not a question of law and not a mixed question of law and fact of the kind that in some cases may allow an appellate court to review the facts to see if they satisfy some legal concept of discriminatory intent. (footnote omitted).

As a result, it left wide open, 456 U.S. at 289 n. 19, 102 S.Ct. at 1790–91 n. 19, the issue of what to do about mixed questions of law and fact:

We need not, therefore, address the much-mooted issue of the applicability of the Rule 52(a) standard to mixed questions of law and fact—i.e., questions in which the historical facts are admitted or established, the rule of law is undisputed, *and the issue is whether the facts satisfy the statutory standard,* or to put it another way, *whether the rule of law as applied to the established facts is or is not violated.* There is substantial authority in the Circuits on both sides of this question. (Emphasis supplied.)

One is left with the unsettling feeling that the choice of a standard of appellate review is at times influenced by the inclination of the reviewing court to reverse or to affirm, that the conclusion is dictated not by the premises but the premises are selected to support the desired conclusion. Where does this leave us with the standard of review for the finding of probable cause in a warrantless setting? Still adrift. Thus, labelling the fact finding under review as conclusory, ultimate, dispositional, or even constitutional does not confer the talismanic ability to provide the answer we seek.

## IX.   *Riddick v. State*

*Riddick v. State,* 319 Md. 180, 571 A.2d 1239 (1990) is not the answer. If *Riddick* is not a false light on the shore, it is, at best, a very faint and unsteady light. Except for *Aiken v. State,* 101 Md.App. 557, 563, 647 A.2d 1229 (1994), which relied exclusively on *Riddick,* the *Riddick* opinion is all we have with respect to the standard of appellate review for a probable cause determination in a warrantless setting.

In *Riddick,* the pivotal issue was whether an Officer Rayburn, as he legitimately looked into Riddick's open duffel bag and saw therein a silver measuring spoon with white powder on it, had the necessary probable cause to reach into the bag and seize the spoon under the Plain View Doctrine. The actual decision of the Court of Appeals was that the seizure was unconstitutional.

What standard of review was used to arrive at that holding is far more uncertain. In what turns out to have been *dicta,* the Court said, 319 Md. at 183, 571 A.2d 1239:

When the question is whether a constitutional right, such as the one here, has been violated, we make our own independent constitutional appraisal.

Again, 319 Md. at 201–02, 571 A.2d 1239, the Court said:

As we note *supra*, when we determine the application of a constitutional right such as the one here, we defer to the trial judge with respect to his findings of facts which are disputed, if his findings are not clearly erroneous. But we do not defer to him with respect to his constitutionally based conclusions reached on those facts. Rather, we make our own constitutional appraisal.

What clearly appears from a close reading of the case, however, is that the Court of Appeals was never called upon to make its own "independent constitutional appraisal" in order to render its decision.

The first fault it found with the trial judge was over the judge's interpretation of a strictly legal issue. The review standard for a legal ruling is the simple "right versus wrong" standard and the Court of Appeals held that the trial judge was wrong as a matter of law. The trial judge had ruled that probable cause was not a necessary prerequisite for a Plain View Doctrine seizure and that the mere opening of the duffel bag, *ipso facto,* conferred on the police the authority to reach into it and seize anything in it. Quite properly, the Court of Appeals held, 319 Md. at 203, 571 A.2d 1239, that this legal interpretation was wrong as a matter of law:

The judge went astray in holding that the mere opening of the bag by Riddick not only permitted the officers to peer into the bag but also to invade it physically and remove objects which were in it. In the circumstances existent, considered in the light of the acceptable factual findings of the judge, we believe that he was wrong.

The reason that that legal ruling had significance was because the trial judge had earlier *found as a matter of fact* that Officer Rayburn did not possess, and did not even purport to possess, probable cause to believe that the spoon was contraband prior to his Plain View Doctrine seizure of it. On

that finding of no probable cause, the Court of Appeals affirmed the trial judge. It did so, however, not by making any independent *de novo* decision of its own in that regard but, rather, by applying the "clearly erroneous" standard and concluding that the fact finding of the trial judge "was not clearly erroneous." On the probable cause issue, the Court, 319 Md. at 204, 571 A.2d 1239, expressly held:

> So, the resolution of this appeal boils down to the third requirement of the "plain view" doctrine. The question is:
>
>> At the time Rayburn observed the spoon in the bag, was it immediately apparent to him, within the strictures of probable cause, that the spoon might be evidence of a crime, contraband, or otherwise subject to seizure.
>
> As we have seen, *the judge answered the question when he found as a fact that it was not then readily apparent* to Rayburn. The judge thought, as we interpret his findings, that it was not until Rayburn removed the spoon from the bag and examined it that it became readily apparent to him that the spoon was evidence tending to show that Riddick was engaged in the illegal drug trade. *This factual finding,* in the face of Rayburn's testimony which the judge believed, *was not clearly erroneous.* But it leaves the third requirement of the "plain view" doctrine unsatisfied. (Emphasis supplied.)

Thus, the critical finding that probable cause did not exist was not a finding made by the Court of Appeals as it independently appraised the situation *de novo*. It was a finding of fact by the trial judge, which the Court of Appeals affirmed because it was not "clearly erroneous." Whatever the *dicta,* the actual decision in *Riddick* did not involve any application of the *de novo* standard of review. The case, therefore, does not stand for the proposition stated in the *dicta.*

Even looking at the *dicta* only in its lesser capacity as possibly persuasive *dicta,* however, we still cannot find an adequate answer to the issue now before us in *Riddick.* The bare and unilluminating references to "independent constitutional appraisal" seem based on nothing more than the easy

assumption that they were stating universally recognized truisms.

In ostensibly applying the *de novo* standard of appellate review to findings of probable cause, *Riddick* would have been dealing with an issue of first impression. The opinion evidenced, however, no awareness that it was ploughing important new doctrinal ground. It cited no authority for adopting, for the first time, such a standard of appellate review. As a substitute for authority, it engaged in no reasoning process as to why that would be the appropriate standard of review. It failed even to take notice of the diametrically opposite standard of review applied to probable cause determinations in the warrant context. *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Potts v. State,* 300 Md. 567, 479 A.2d 1335 (1984). The *Riddick dicta* seems to have been based on nothing more than the erroneous assumption that the review of *any* constitutional determination automatically calls for the *de novo* review standard, an assumption we have labored to demonstrate is clearly not correct. *Hernandez v. New York,* 500 U.S. 352, 366–67, 111 S.Ct. 1859, 1869–70, 114 L.Ed.2d 395, 410 (1991); *Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982).

In short, *Riddick* cannot be taken as an answer when every indication is that *Riddick* was not even aware of a question. *Riddick,* moreover, failed to maintain a constant focus. It talked about one standard of appellate review, but used two others. It may turn out, of course, that *Riddick* is correct in what it seems increasingly to be accepted as having established. If such should be the case, however, it will only be by random chance. The application of the *de novo* review standard to findings of probable cause in a warrantless setting, if that is to be the law, must be found to rest on some more substantial basis than the *Riddick dicta.* Thus, *Riddick v. State* does not provide us the answer we seek.

### X. *Assessing Residual Probable Cause After Factoring Out Possible "Taint"*

One off-the-beaten-track set of cases may afford some insight by giving us, in effect, a mirror image of the probable

cause measuring process. Under *Franks v. Delaware,* 438 U.S. 154, 156, 171–72, 98 S.Ct. 2674, 2676–77, 2684–85, 57 L.Ed.2d 667, 672, 682 (1978), a suppression hearing judge, and sometimes a reviewing appellate court, are at times called upon to assess probable cause from the slightly unorthodox angle of subtracting rather than adding. When an otherwise viable claim is made that tainted information has contributed to a finding of probable cause in support of a warrant and that a *Franks* hearing should, therefore, be held, the court must engage in a hypothetical probable cause measurement. If the allegedly tainted information is factored out, will the remaining untainted information constitute probable cause or not? If it will, the allegedly tainted information is mere surplusage and no *Franks* hearing is required.

Sometimes an appellate court, on review, must deal with this hypothetical assessment. It is no different, however, than any other appellate assessment of probable cause. In the ordinary context, the appellate court is asked, "Does x equal probable cause?" In the hypothetical *Franks* context, the appellate court is asked, "Does x minus y still equal probable cause?" The difference between the two questions is only mathematical, not doctrinal.

The Supreme Court has shown a tendency to make this probable cause measurement on an independent *de novo* basis. In *United States v. Karo,* 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), the application for a search warrant for a house in Taos, New Mexico, demonstrated "within its four corners" probable cause. At a pretrial suppression hearing, however, the defendants had successfully shown that constitutionally tainted information had gone into the warrant application. The warrant was thereby deemed invalid and the evidence was suppressed. The United States Court of Appeals for the Tenth Circuit affirmed that ruling.

The Supreme Court reversed. *Karo* engaged in the hypothetical factoring out process mandated by *Franks* and then, 468 U.S. at 719, 104 S.Ct. at 3305, made its own independent

*de novo* determination that what remained, after the factoring
out, constituted probable cause:

> That information, which was included in the warrant affida-
> vit, would also invalidate the warrant for the search of the
> house if it proved to be critical to establishing probable
> cause for the issuance of the warrant. However, if suffi-
> cient untainted evidence was presented in the warrant
> affidavit to establish probable cause, the warrant was never-
> theless valid. *Franks v. Delaware.*
>
> It requires only a casual examination of the warrant
> affidavit, which in relevant respects consists of undisputed
> factual assertions, to conclude that the officers could have
> secured the warrant without relying on the beeper to locate
> the ether in the house sought to be searched. (Citation
> omitted.)

It did not remand so that the suppression hearing judge could,
in the first instance, make the hypothetical probable cause
measurement. It made, 468 U.S. at 721, 104 S.Ct. at 3306, its
own final determination:

> [I]t is clear that the warrant affidavit, after striking the
> facts about monitoring the beeper while it was in the Taos
> residence, contained sufficient untainted information to fur-
> nish probable cause for the issuance of the search warrant.
> The evidence seized in the house should not have been
> suppressed with respect to any of the respondents. (foot-
> note omitted).

In *State v. Klingenstein,* 92 Md.App. 325, 362, 608 A.2d 792
(1992), this Court followed the lead of *United States v. Karo*
and made its own independent *de novo* determination of
whether "x − y = probable cause":

> Applying the *Franks v. Delaware* principle to the search of
> the appellee's home yields a simple conclusion. The men-
> tion in the warrant application for the home that Schedule
> II drugs had been recovered in the search of the pharmacy
> was not an indispensable or pivotal component of probable
> cause. It was a *de minimis* triviality. Remaining, untaint-
> ed information abundantly established probable cause for

the search of the appellee's home. In all likelihood, if we factored out the very fact that the pharmacy had ever been searched, the probable cause for the search of the home would not be fatally eroded. *A fortiori,* factoring out the passing mention of those items seized that were a scope violation would not fatally erode that probable cause. There was no justification for the invalidation of the warrant to search the home and for the suppression of its fruits.

In *Klingenstein v. State,* 330 Md. 402, 414–15, 624 A.2d 532 (1993), however, the Court of Appeals seemed disinclined to make an independent *de novo* determination of probable cause:

> [T]he culling of tainted information and the determination of whether the remaining untainted information is adequate to show probable cause is also a matter for the hearing judge in the first instance. The further proceedings on remand to the circuit court should be to that end, not strictured by a culling by the appellate court and a holding by it that the remaining untainted information was adequate. If the hearing judge concludes, after factoring out the tainted information, that the information remaining established probable cause for the issuance of the warrant, he should, of course, uphold it and deny the motion to suppress insofar as it is founded on the unconstitutionality of the issuance of the warrant. The appellate court will then be in a position to perform its function of making an independent constitutional appraisal of the propriety of the hearing court's rulings.

If it is, indeed, for the appellate court in the last analysis to make its own independent *de novo* determination as to probable cause and not simply to screen for trial error, the purpose of the remand to the suppression hearing judge seems unclear. That is particularly so in the warrant context, where the suppression hearing judge and the appellate court alike are in precisely the same vantage point from which to review, in a highly deferential fashion, the initial determination of the warrant-issuing magistrate. *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). If as *Illinois v. Gates* dictates, the appellate court is required to uphold a warrant if

there is (even after the *Franks* factoring out process) any "substantial basis" for doing so, what difference would it make what the suppression hearing judge might do on remand? There is an unresolved tension between *Klingenstein v. State* and *Riddick v. State.*

None of those three opinions, however, really contributes much to the discussion of an appropriate standard of appellate review for probable cause, for what each of the three did in that regard was done completely *sub silentio.* There is no indication that any of the three even consciously considered the issue of competing appellate review standards. There may have been a general failure to appreciate that what is measured in the *Franks* context ("x − y") is no different than what is measured in the normal probable cause assessment ("x"). Thus, *Franks v. Delaware, State v. Klingenstein,* and *Klingenstein v. State,* either alone or in combination, do not provide us the answer we seek.

## *XI. A Principled Decision*

The principled answer we are seeking may turn out to be the *en banc* decision of the United States Court of Appeals for the Ninth Circuit in the case of *United States v. McConney,* 728 F.2d 1195 (1984). The *McConney* opinion, to be sure, dealt with Fourth Amendment exigency rather than Fourth Amendment probable cause, but its detailed analysis of the respective strengths and weaknesses of the different standards of appellate review and of the respective efficacies of the review standards to different types of issues is forcefully persuasive to probable cause review as well.

At the outset, *McConney* acknowledged, 728 F.2d at 1200, that the law generally in this area "lacks clarity and coherence":

> [W]e find a number of indications that our jurisprudence concerning appellate review of mixed questions lacks clarity and coherence.... This difficulty doubtless reflects the absence of clear legal guideposts in this area of the law.

When it comes to reviewing mixed questions of law and fact, the lower federal courts are in "disarray" because the Supreme Court itself has not achieved any consistency:

> This disarray in standard of review jurisprudence appears to be pervasive. The Supreme Court recently stated that "there is substantial authority in the circuits on both sides of [the question of the applicability of the rule 52(a) clearly erroneous standard to mixed questions of law and fact] ... The Court also acknowledged that, while it has usually reviewed mixed questions independently, its precedents are not entirely consistent and there is support in its decisions for clearly erroneous review of some mixed questions.

*Id.* At long last, an opinion began to grapple with an enigma that lies at the very core of the appellate process.

The essential problem is that on the wide continuum that runs from the very concrete finding that "the defendant at 11:30 p.m. was standing on the corner of 4th and Main" to the very abstract finding that "there was probable cause to believe that the defendant was distributing crack cocaine," there are an infinite number of possible intermediate findings, with each almost imperceptibly a little less concrete and a little more abstract than the one before. As has been noted by Kenneth Culp Davis, *Administrative Law Treatise* § 16.06:

> At some point in the process of abstracting "ultimate facts" from "basic facts," the trial court crosses the line from making findings of fact to making conclusions of law.

Our problem is that of locating the precise point where the line crosses the continuum. Inevitably, it will be a point where a barely discernible change in the thing to be reviewed, a change almost impossible to verbalize, will precipitate a dramatic change in the nature and standard of that review.

In any mixed question of law and fact, there are three distinct phenomena involved: 1) the purely historic or "first-level" facts, 2) the law in the abstract, and 3) the "mixed question" of the application of those facts to that law. *McConney* explained, 728 F.2d at 1200:

[T]here are three distinct steps in deciding a mixed fact-law question. The first step is the establishment of the "basic, primary, or historical facts: facts 'in the sense of a recital of external events and the credibility of their narrators'." ... The second step is the selection of the applicable rule of law. *The third step—and the most troublesome for standard of review purposes—is the application of law to fact* or, in other words, the determination "whether the rule of law as applied to the established facts is or is not violated." (citations omitted) (Emphasis supplied.)

The appropriate standards of appellate review for the first two phenomena are settled: 1) the deferential "clearly erroneous" standard for the purely factual determinations and 2) the non-deferential *de novo* standard for the abstract legal determinations:

The appropriate standard of review for the first two of the district court's determinations—its establishment of historical facts and its selection of the relevant legal principle—has long been settled. Questions of fact are reviewed under the deferential, clearly erroneous standard. Questions of law are reviewed under the non-deferential, de novo standard. (Citations omitted.)

728 F.2d at 1200–01.

On pure factfinding, the appellate court is appropriately deferential because the trial court is better able than the appellate court to make accurate findings of fact:

[I]t minimizes the risk of judicial error by assigning primary responsibility for resolving factual disputes to the court in the "superior position" to evaluate and weigh the evidence— the trial court. Rule 52(a) emphasizes that the trial judge's opportunity to judge the accuracy of witnesses' recollections and make credibility determinations in cases in which live testimony is presented gives him a significant advantage over appellate judges in evaluating and weighing the evidence[.]

728 F.2d at 1201.

The advantage, however, swings in favor of the appellate court when it comes to determinations of law:

Structurally, appellate courts have several advantages over trial courts in deciding questions of law. First, appellate judges are freer to concentrate on legal questions because they are not encumbered, as are trial judges, by the vital, but time-consuming, process of hearing evidence. Second, the judgment of at least three members of an appellate panel is brought to bear on every case. It stands to reason that the collaborative, deliberative process of appellate courts reduces the risk of judicial error on questions of law. (footnote omitted).

*Id.* Each level of court is called upon to do what it does better:

Thus, de novo review of questions of law, like clearly erroneous review of questions of fact, serves to minimize judicial error by assigning to the court best positioned to decide the issue the primary responsibility for doing so.

*Id.* The interests of predictability and *stare decisis,* moreover, come into play with legal decisions at the appellate level, but not with factual decisions:

De novo review of questions of law, however, is dictated by still another concern. Under the doctrine of stare decisis, appellate rulings of law become controlling precedent and, consequently, affect the rights of future litigants. Rulings on factual issues, on the other hand, are generally of concern only to the immediate litigants. From the standpoint of sound judicial administration, therefore, it makes sense to concentrate appellate resources on ensuring the correctness of determinations of law.

*Id.*

It is the third of the phenomena—the mixed question—that poses the problem. That phenomenon lies somewhere *between* the other two. The ultimate resolution may be a simple determination, not for all mixed questions categorically but on an *ad hoc* question by question basis, as to which of the two fixed poles it lies closer to or more closely resembles:

Thus, we have a well developed standard of review jurisprudence for issues of fact and issues of law. Yet, when we

review the third of the district court's determinations—its application of law to fact—we confront "a much-mooted issue" with "substantial authority in the circuits on both sides of th[e] question." We believe, however, that the well developed jurisprudence relating to questions of pure law and pure fact offers guideposts for working our way out of this confusion. (Citation omitted.)

728 F.2d at 1202.

There are various mixed questions of law and fact and the mixtures vary. When the resolution of the issue has a predominantly or heavily factual character to it, the "clearly erroneous standard" would appear to be more appropriate. Where, on the other hand, the resolution is more legal in character, the better standard becomes *de novo* review:

If application of the rule of law to the facts requires an inquiry that is "essentially factual," one that is founded "on the application of the fact-finding tribunal's experience with the mainsprings of human contact," the concerns of judicial administration will favor the district court, and the district court's determination should be classified as one of fact reviewable under the clearly erroneous standard. If, on the other hand, the question requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles, then the concerns of judicial administration will favor the appellate court, and the question should be classified as one of law and reviewed de novo. (Citations omitted.)

*Id.*

■ Although mixed questions involving constitutional issues are not, *ipso facto*, subject to *de novo* review, the constitutionality of the issue is nevertheless a significant factor tilting the question toward the legal side of the spectrum:

The predominance of factors favoring *de novo* review is even more striking when the mixed question implicates constitutional rights. In cases involving such questions, the application of law to fact will usually require that the court

look to the well defined body of law concerning the relevant constitutional provision.

728 F.2d at 1203.

When the mixed question, even be it a constitutional question, is predominantly one of fact, on the other hand, it is the "clearly erroneous" standard that should prevail.

> There are, however, some types of mixed questions that are exceptions to this general predominance of factors favoring *de novo* review. First, there are those mixed questions in which the applicable legal standard provides for a strictly factual test, such as state of mind, and the application of law to fact, consequently, involves an "essentially factual" inquiry. In *Pullman–Standard*, for example, the mixed question before the court was whether the established facts demonstrated the intent to discriminate required by section 703(h) of title VII of the Civil Rights Act of 1964. Since, for the purposes of section 703(h) of title VII, intent means subjective intent, the relevant legal standard was that of "actual motive." ... On this basis, the Court concluded that in the case before it the concerns of judicial administration favored the district court and that the mixed question under consideration thus "[was] not ... a mixed question of law and fact of the kind that in some cases may allow an appellate court to review the facts." The Court subjected the lower court's determination to clearly erroneous review. (footnote and citations omitted).

*Id.*

The fact-heavy nature of a finding as to subjective intent is what made the peremptory challenge question in *Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), one subject to "clearly erroneous" review, notwithstanding its constitutional status. In the double jeopardy area as well, it is the subjective intent of the prosecutor that determines, in the mistrial/retrial area, whether there has been prosecutorial overreaching. It also is one of those mixed questions of law and fact that, even though constitutional, is

subject to deferential "clearly erroneous" review. The *McConney* opinion noted, 728 F.2d at 1203 n. 10:

> Similarly, in *Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), the Supreme Court considered the issue of when a retrial is barred, under the double jeopardy clause, by prosecutorial conduct that results in a mistrial. After holding that a retrial is barred only when the conduct giving rise to the successful motion for a mistrial was "intended" to provoke the defendant into moving for a mistrial, the Court indicated that lower court findings on this question were to be reviewed deferentially.

The *McConney* Court then decided that the Fourth Amendment issue of whether the police were faced with a sufficient exigency to permit them to ignore the warrant requirement was a mixed question that involved significantly more than the resolution of disputed facts. It concluded that "to decide if the facts satisfy the legal test ... necessarily involves us in an inquiry that goes beyond the historic facts." 728 F.2d at 1205. It concluded that the issue was one calling for an independent *de novo* determination because:

> The mixed question of exigency is rooted in constitutional principles and policies. Like many such mixed questions, its resolution requires us to consider abstract legal doctrines, to weigh underlying policy considerations, and to balance competing legal interests. In particular, its resolution requires that we strike a balance between two sometimes conflicting societal values—the safety of law enforcement officers and fourth amendment privacy interests. (footnotes omitted).

*Id.*

What the *McConney* Court concluded with respect to exigency would apply with equal, if not greater, force to the issue of probable cause:

> When, as here, the application of law to fact requires us to make value judgments about the law and its policy underpinnings, ... the policy reasons for *de novo* review

are satisfied and we should not hesitate to review the district judge's determination independently.

*Id.*

## XII. The Issue of Probable Cause is Subject to De Novo Review

Guided significantly by the reasoned analysis of the Ninth Circuit, we hold that a finding of probable cause is one of those mixed questions of law and fact that lies decidedly more toward the legal edge of the borderland shared by law and fact and, therefore, calls for independent *de novo* judgment on appellate review.

It is a question, as the Ninth Circuit pointed out, that "is rooted in constitutional principles and policies." Unlike such purely factual issues as the actual intent or motive of a prosecutor, it "requires us to consider abstract legal doctrines." It involves the weighing of "underlying policy considerations" and the balancing of "competing legal interests." In the last analysis, its resolution requires that "we strike a balance between two sometimes conflicting societal values"—the efficient pursuit of law and order and Fourth Amendment privacy interests.

Our concern is not with parsing and analyzing precisely what it was that Judge Thieme found. We must decide for ourselves whether Officer Ottey, before he thrust his hand *into* the pocket of Samuel Jones, had probable cause to believe that that pocket contained crack cocaine.

## XIII. The De Novo Determination of Probable Cause

As we prepare to make, *de novo,* our independent probable cause determination, it becomes necessary to ask "Probable cause when?" or "Probable cause on the part of whom?" Probable cause, although it contains some objective and historic factual elements, does not exist in a vacuum or in a test tube in a law school. It is, when it all comes together, a state of mind—a measurable level of suspicion—*on the part of someone.* Who is that *someone* who matters?

In the warrant context, that *someone* is the warrant-issuing magistrate. It is the magistrate who must possess the probable cause. The concern of the reviewing judge, *nisi prius* or appellate, is with what was in the head of the magistrate: "What did he know?"; "When did he know it?"; and "Was it enough?"

In the warrantless context, that *someone* is the officer who presumes to act on that probable cause. The possession of probable cause *on the part of the officer* determines the *reasonableness* of the *officer's conduct,* which is the ultimate concern of the Fourth Amendment. The question for Judge Thieme was not whether Judge Thieme had probable cause, but whether Judge Thieme concluded that Officer Ottey had probable cause. Several sub-elements are therein involved: 1) What information did Officer Ottey possess?; 2) Was that information, objectively speaking, enough *to permit* Officer Ottey to conclude that he had probable cause? and 3) Did Officer Ottey then so conclude?

Similarly, our independent *de novo* concern is not with whether we, were we on the street, would conclude that probable cause existed. Nor is our concern with whether Judge Thieme, had he been on the street, could properly have found or have failed to find probable cause. Our only concern is with whether *Officer Ottey* had the legally sufficient minimum of data necessary to *permit him* reasonably to conclude that probable cause existed. Thus, the question on review, either by Judge Thieme or by us *de novo,* resolves itself into a legal question of *the legal sufficiency of the probable cause evidence* and not the far more factual question of whether either we or Judge Thieme, had we been on the street, would *actually have been persuaded* that probable cause existed.

To *persuade* any of us, depending on our individual value judgments and idiosyncrasies, might require more than legally sufficient evidence of probable cause, but the focus is not on any of us. It is only on Officer Ottey, the propriety of whose conduct, after all, was and is the only subject of review. Was the evidence of probable cause sufficient to *permit* Officer

Ottey reasonably to reach the conclusion he did? Thus, we are not concerned with the broader probable cause spectrum, at various points along which different fact finders might individually be *persuaded* that probable cause was triggered. We are only concerned with the single point where that probable cause spectrum begins, with the point where the suspicious circumstances become legally sufficient so that someone (the officer) *could* reasonably conclude that probable cause existed.

As we approach our *de novo* fact finding, our freedom to range is far more limited than was Judge Thieme's. He had before him, of course, all of the evidence from the suppression hearing and all of the inferences that reasonably could be drawn therefrom. He was free to make a wide variety of findings as to specific, historic, "first-level" facts. We, by contrast, enjoy no such latitude. In making a *de novo* determination on the ultimate issue of probable cause, we are constrained to consider only those historic or first-level facts that were either 1) undisputed or 2) the actual and non-clearly-erroneous findings of Judge Thieme.

Forgetting the procedural proprieties and looking only to the substantive issue of probable cause, the Court is unanimously agreed that two historic facts, at the very least, are on the table for *de novo* consideration. The first (Fact A) is that the neighborhood wherein Samuel Jones was observed at the time he was accosted on the evening of December 16 was a well known "open-air drug market" about which the police had received numerous citizen complaints and wherein they had made numerous drug arrests. The second historic fact (Fact B) is that Officer Ottey, through the cloth of Jones's pants, squeezed a bulge and felt "numerous rock-like substances." Fact A and Fact B were found by Judge Thieme and are, therefore, predicate facts from which we may make our *de novo* probable cause determination.

There is a third "fact" or "thing" or "element" or "factor" that is, even if we knew what to call it, far more problematic, because it has possible significance at two different levels. It

is Officer Ottey's conclusion that the rock-like substance he felt in Jones's pocket was "immediately apparent" to him as crack cocaine, to wit, probable cause to believe that what he felt was contraband. To see what is before us for *de novo* review, we must distinguish the *fact* of Officer Ottey's conclusion from the *accuracy* of Officer Ottey's conclusion or the *adequacy* of the basis for that conclusion.

Judge Thieme rejected the *accuracy* or the *adequacy* of that conclusion, which means that he did not endorse it as reasonable. That is the ultimate probable cause determination, which, by definition, is subject to independent *de novo* review. Even accepting Officer Ottey as a credible expert, Judge Thieme determined that a single squeeze of rock-like substances through a layer or two of cloth was not an adequate basis to permit even an acknowledged expert in the feel of crack cocaine to form an opinion that what was felt was crack cocaine. This is not a first-level or historic fact. It is the ultimate conclusory fact, of constitutional significance, for first Judge Thieme's determination and now for our independent *de novo* determination.

We find troubling several aspects of Judge Thieme's determination. He seemed to accept the truth of all of the premises that went into the building of a syllogism and then, inexplicably, found the conclusion invalid. He accepted fully the credibility of Officer Ottey. He accepted the historic facts of the "open-air drug market" and of the detection of the rock-like substance in Jones's pocket by Officer Ottey. He accepted Officer Ottey as an expert on the feel of crack cocaine, for that was the only issue on which Officer Ottey's expertise had any possible relevance. He accepted the fact that Officer Ottey concluded that what he felt was crack cocaine. Judge Thieme simply declined to accept the validity of Officer Ottey's conclusion.

If the officer was accepted as having the expert ability to recognize crack cocaine through touch alone, what basis could there be for the expert opinion except to touch the object of the inquiry? If Judge Thieme had been concerned with the

possible effect of a layer or two of cloth on the sensitivity of the touching, the officer was before him for questioning as to the impact of such interference. In effect the decision was, "I accept the officer's expert ability to recognize crack cocaine when he felt it. He said that what he felt was crack cocaine, but I don't buy it."

If Judge Thieme was saying that he cannot accept the possibility that a brief feel, through cloth, could ever constitute probable cause to believe that the thing felt was contraband drugs, then he would have been overruling *Minnesota v. Dickerson,* 508 U.S. ——, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993), which he cannot legally do. We reject, as too cynical on our part, even entertaining the possibility that Judge Thieme was actually far more skeptical than he appeared to be of the credibility of the police version of the whole incident but chose to cast his suppression ruling in more politic terms. It is not for us to probe hidden agendas.

In any event, the propriety of Judge Thieme's ruling is no longer material. The issue decided was the existence *vel non* of probable cause on the part of the officer. The appellate review of such an issue calls for our own independent *de novo* determination of whether Officer Ottey had enough data to permit him reasonably to conclude that he had probable cause.

In that regard, the historic fact of Officer Ottey's conclusion, even if not its accuracy, is before us for our review. It is our independent determination that 1) the presence of Jones on a corner in an "open-air drug market"; 2) the detection of rock-like substances in Jones's pocket; 3) the officer's expert ability, based on his training and expertise, to recognize the feel of crack cocaine; and 4) the officer's conclusion that the rock-like substance he felt was crack cocaine was a legally sufficient basis to support the officer's probable cause determination.

Since the officer's subsequent warrantless seizure of the crack cocaine was reasonable, the evidence should not have been suppressed.

We note, parenthetically, that even if we were to reject (we are not), in the words of the dissent, "Officer Ottey's ability to distinguish crack cocaine from some other granular substance tactilely," we would still find the remaining circumstances a sufficient basis to have *permitted* Officer Ottey reasonably to conclude that probable cause existed.

What other possible "granular substance" could the dissent be talking about? Officer Ottey was not engaged in a tactile exercise in a seventh-grade science classroom. He was standing on an Annapolis street corner in an "open-air drug market." When, at that time and in that place, he felt "rock-like substances" in Jones's pants pocket, we cannot conceive of what those "rock-like substances" would be other than crack cocaine. A pocketful of ungranulated sugar? A collection of ground glass? Balderdash!

One would have to strain to come up with an innocent explanation and the probable cause standard does not require such straining. "[I]t is clear that 'only the probability, and not a *prima facie* showing, of criminal activity is the standard of probable cause.'" *Illinois v. Gates,* 462 U.S. 213, 235, 103 S.Ct. 2317, 2330, 76 L.Ed.2d 527 (1983).

*ORDER SUPPRESSING THE PHYSICAL EVIDENCE VACATED AND CASE REMANDED FOR TRIAL; COSTS TO BE PAID BY APPELLEE.*

BLOOM, Judge, dissenting.

It is with considerable reluctance that I dissent in this case. Expressing disagreement with one of Judge Moylan's meticulously crafted opinions is difficult at best; disputing with him on a Fourth Amendment issue might well be perceived as presumptuous or, at least, injudicious.

Nevertheless, being convinced that Judge Thieme's ruling should be affirmed, I think it incumbent upon me to say why.

The State had the burden of proving that Officer Ottey had probable cause to reach into the appellee's pants pocket, after the appellee had rescinded his consent to be searched, and to seize what he *believed* to be crack cocaine when he felt

"numerous rock like substances" in the appellee's pocket while permissively patting down the exterior of the appellee's clothing. What Judge Thieme concluded was that the State had failed to prove a fact necessary to support the reasonableness of that belief.

Judge Thieme stated that he had read the Supreme Court case (*Minnesota v. Dickerson*, 508 U.S. ——, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993)) that recognized the "Plain Feel Doctrine," which is analogous to the "Plain View Doctrine." He was aware, then, that he is obliged to accept, as a matter of law, that it may be readily apparent to an experienced officer that an object he feels through layers of cloth is crack cocaine, just as he is obliged to accept, as a matter of law, that it may be readily apparent to an experienced officer that the object he sees through a transparent cellophane or plastic bag is crack cocaine.

Although he accepted Officer Ottey as an expert witness, *i.e.*, one who by training and experience is able to recognize crack cocaine by sight and by touch, Judge Thieme concluded that there had been presented insufficient evidence as to the extent of the officer's training, experience, or tactile acuity to persuade him, as trier of fact, that it was "readily apparent" to the officer that what he felt in Jones's pocket while "patting him down" was crack cocaine. Certainly, that determination was first level fact-finding, which, not being clearly erroneous, is binding on us. Md.Rule 8–131(c). By analogy, if a suppression motion hearing judge were to conclude that he was not persuaded that an "expert," a police officer with considerable experience in identifying controlled dangerous substances, was capable of recognizing, from the distance between him and the substance and under the lighting conditions at the time of the observation, the substance he saw in the suspect's hand as crack cocaine, we would undoubtedly uphold that first level fact-finding and, unless there were other factors furnishing sufficient reason for the officer to believe that what he saw the suspect hold in his hand and then place in his pocket was a controlled dangerous substance, we would likewise uphold the ensuing conclusion by the judge that there was no probable

cause to arrest the suspect or to reach into his pocket and seize whatever was in there. I perceive no legal distinction between that hypothetical situation and the case at hand.

Other than Officer Ottey's opinion that what he felt in Jones's pocket was cocaine—an opinion that Judge Thieme did not accept because he did not believe that there was a sufficient factual basis for it—what factors were there that would have supported probable cause to believe that there was contraband in the pocket? The majority believes that because Jones and another man were standing on the corner of Carver Street and Dorsey Avenue in Annapolis, which is known to the police to be "an open air drug market" and the officer felt something in Jones's pocket that he described as "numerous rock-like substances," the officer had probable cause to believe that substance to be crack cocaine even if he could not tactilely distinguish crack cocaine from some other "rock-like" or granular substance. Given the character of the area, they cannot conceive of what the "rock-like substance" would be other than crack cocaine.

I would remind my colleagues that the area described by the police as "an open air drug market" may be used for that illicit purpose by some people but is, in actuality, a street corner in a residential neighborhood, that most people in a residential neighborhood are law-abiding, and that an individual who happens to be in that neighborhood is therefore more likely to be a non-drug-dealing resident than a seller or buyer of drugs. Consequently, although the police may regard with suspicion someone they see on a street corner in that neighborhood, the presence of two pedestrians on any residential neighborhood street corner cannot conceivably amount to probable cause to believe that either of them is in possession of contraband. That would be giving far too much weight to the police designation of the area as "an open air drug market." Having no greater tactile acuity (and certainly far less experience with the look and feel of drugs) than Judge Thieme ascribed to Officer Ottey, I have no idea what kind of small, hard objects might feel like and thus might be taken for

cocaine when palpated through layers of cloth. Small candies, perhaps?

What this case boils down to, once we defer to Judge Thieme's finding that he does not accept the officers's assertion that it was readily apparent to him that what he felt was crack cocaine, is that the officer's seizure of the substance from appellee's pocket was based on suspicion, not probable cause. An experienced police officer observed two men conversing on a street corner in a residential neighborhood, where drugs are sold with some degree of frequency. One of those men had something in his pants pocket that could have been crack cocaine. Because of the neighborhood, the officer, perhaps reasonably, *suspected* that the substance was crack cocaine, and based on that suspicion, which does not amount to probable cause, he seized the substance.

No matter what standard of review should be applied to the decision that Officer Ottey lacked probable cause to seize the substance in question from the appellee's pocket, I am convinced that Judge Thieme properly decided that probable cause was lacking, and I would affirm his suppression order.